**UNITED STATES of America**

v.

**Peter BOYLAN, et al.**

**Crim. A. No. 87–342–MA.**

United States District Court, D. Massachusetts.

Oct. 7, 1988.

As Amended Oct. 11, 1988.

---

Diane M. Kottmyer, James B. Farmer, Boston, Mass., for U.S.

Thomas J. Ford, Boston, Mass., Paul Buckley, Milton, Mass., Buckley, Haight, Muldoon, for defendant Peter Boylan.

Regina Quinlan, Boston, Mass., for defendant John E. Carey.

Albert F. Cullen, Jr., law offices of Albert F. Cullen, Jr., Boston, Mass., for defendant Thomas J. Connolly.

Martin K. Leppo, Leppo & Traini, Randolph, Mass., for defendant Matthew A. Kilroe.

Anthony M. Cardinale, Boston, Mass., for defendant John F. McCormick.

Paul F. Markham, Boston, Mass., for defendant Kenneth J. Nave.

Robert Muse, Boston, Mass., for defendant Francis X. Sheehan.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before the Court on defendants' various motions based on jury misconduct. The events which precipitated these motions began on September 13, 1988 when a jury returned a guilty verdict on fifty-six of fifty-seven counts against seven defendants following an eleven week trial. On September 16, three days after the verdict was returned, a juror phoned Paul F. Markham, one of the defense counsel, and stated that the jurors had discussed the case during the trial and were predisposed to find the defendants guilty before deliberations began. According to an affidavit subsequently filed with the Court by Mr. Markham, the juror expressed a desire to speak only to defense counsel. Mindful of *United States v. Kepreos*, 759 F.2d 961 (1st Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985), Mr. Markham contacted me at home and advised me of the juror's call. Also mindful of *Kepreos*, I set the matter down for hearing at which defense counsel moved jointly to interview the juror without the presence or participation of either the Court or the government. I decided to interview the juror in the presence of all counsel pursuant to Fed.R.Evid. 606(b), although I did not rule formally on the defendants' motion. The juror's identity was not divulged to me or to the government until he appeared at the hearing on September 20. At that hearing, the juror reiterated the statement he had made to Mr. Markham. He also stated that a particular magazine article and unspecified newspapers had circulated among jurors in the jury room. As a result of this initial interview, I decided to question the entire panel, including the alternates. Fourteen jurors were interviewed on September 21 and the last juror was interviewed on September 26.

Following the interviews, the defendants moved for a new trial incorporating within the motion a request for an evidentiary hearing. The motions present the following issues: (1) whether defense counsel should have been permitted to interview the juror without the Court present; (2) whether I should grant the motion for a new trial based on the claim that extraneous prejudicial information reached the jury and that the jury was predisposed to convict the defendants; and (3) whether I should order a formal evidentiary hearing, before another judge, at which the jurors would be questioned and cross-examined while under oath.

I set out the facts of this case in detail because they are crucial to understanding the serious issues raised by the defendants' motions. In so doing I am mindful of the Supreme Court's admonition that ultimately, "each case [of alleged juror misconduct] must turn on its own special facts." *Mar-*

*shall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959) (per curiam); *see also Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring) ("each case must turn on its own facts ... [except in] some extreme situations"); *Neron v. Tierney,* 841 F.2d 1197, 1201 (1st Cir.1988) ('[w]e have long acknowledged the case-specific nature of such explorations").

### I.

On November 9, 1987, three current and four former members of the Boston Police Department were indicted for violations of federal anti-racketeering and anti-corruption laws. The fifty-seven count indictment charged the defendants with soliciting and accepting money and other things of value from certain bars and nightclubs in exchange for special services and help in avoiding certain licensing requirements.[1] Jury selection began on June 27, 1988, from a panel of approximately 150 jurors. The panel was first subjected to a general voir dire consisting of standard questions about their knowledge of any parties, lawyers, or witnesses in the case, exposure to any publicity about the case, and any strong feelings about or connection with law enforcement or licensing boards. Then the panel was given preliminary instructions about general principles of law applicable to criminal cases, including the presumption of innocence. The panel was advised that it was their duty to render a verdict based solely on the evidence. Other routine questions followed, including inquiries about any prior experience as jurors, any disabilities that might interfere with jury service, and whether anything might prevent them from serving for at least eight weeks, the expected duration of this case. Jurors who responded affirmatively to these inquiries were then ques-

tioned individually at sidebar outside the hearing of the rest of the panel.

Following this general screening, each juror was called into the lobby for an additional individual voir dire. The purpose of this voir dire was to address certain sensitive and particularly significant matters, most notably the homosexual clientele of some of the establishments involved in this case. The issue of alleged corruption in the Boston Police Department was also addressed. All seven defendants were present. Both defense and government counsel participated in the questioning. The media was invited to attend and remained present at least through the beginning of the inquiry. After some jurors were excused for cause as a result of this voir dire, a panel of thirty-eight was chosen randomly from those remaining. The parties consulted amongst themselves and exercised their peremptory challenges, selecting a panel of sixteen jurors. Counsel agreed that four of these jurors would be randomly designated as alternates before deliberations began.

After the jury was sworn and in accordance with my usual practice, I gave the jury preliminary instructions before counsel made their opening statements. Each juror was provided with a notebook and instructed on the taking and use of notes. I admonished them not to discuss the case among themselves or with others, and not to read, watch or listen to any media reports about the trial. Similar instructions were repeated from time to time throughout the trial, especially the instruction about media reports because of the significant publicity attending the trial. On several occasions, at the request of counsel, I asked the jury whether they had seen or read a particular newspaper or magazine article. The responses to these inquiries were negative. I was not asked to inquire about the specific magazine article which the defendants claim prejudiced the jury in

---

1. Not every defendant was charged on every count. The first two counts charged all seven defendants with violations of 18 U.S.C. §§ 1962(c) and (d) (RICO). Five counts charged various defendants with violations of 18 U.S.C. § 1951 (conspiracy to extort). Thirty-

one counts charged various defendants with violations of 18 U.S.C. §§ 1951–2 (extortion). Seventeen counts charged two defendants with violations of 18 U.S.C. §§ 1341–2 (mail fraud). The last count charged the same two under 18 U.S.C. § 371 (conspiracy to commit mail fraud).

this case, although I was informed of the article at a sidebar conference.

The trial lasted forty-seven days. The evidence consisted of the testimony of seventy-two witnesses and over 300 exhibits, including many audio and video tapes of meetings between some defendants and key government witnesses. The trial, while protracted and contentious, was not factually complex. In opening statements, defense counsel outlined the evidence they believed was forthcoming, and stated that it would demonstrate that the defendants merely accepted gifts or gratuities and were not bribed or involved in extorting payments. These conflicting theories were presented clearly, forcefully and consistently to the jury.

Each juror was present at every day of the trial, which continued day to day except for one holiday and one day when I was required to attend a meeting in Washington. The trial day began at 9:30 A.M. and concluded at 2:00 P.M. Pastries and beverages were provided daily to the jury during a late-morning break. The jury was attended by the same two experienced and capable court officers throughout the trial. Jurors entered and departed the courthouse by rear elevators not generally available for public access to the twelfth floor level. This regimen, it can be seen, placed the jurors in close and isolated daily contact with each other during the trial.

The jury received their final instructions on September 6, 1988. The four alternates were randomly chosen and the remaining twelve began their deliberations that afternoon. They deliberated for approximately thirty-five hours over five and one-half days. On their first day, they requested a list of the exhibits, copies of the indictment and charge, and a trial transcript.[2] They also requested an audio tape player and video cassette recorder and spent nearly an entire day reviewing tapes. While they were deliberating they also submitted several questions to the Court, including one

about a confusing typographical error in the indictment which had escaped the attention of both the Court and all counsel, and another in which they sought to learn why a specific dollar amount was missing from Count 16.

On the fourth day of deliberations, a newspaper article was published about a speech made by the Chief of the Justice Department's New England Organized Crime Strike Force. The speech referred to the role certain criminal defense lawyers allegedly played in aiding their clients to identify and "silence" government informants. Although no lawyers were named, a reputed leader of organized crime was identified. This person had been previously represented by Anthony Cardinale, a lawyer representing a defendant in this case. The author of the story solicited a response from Mr. Cardinale which appeared at the end of the article. At the defendants' request the Court asked the jury if they had read the article. One juror responded that he had read the article.[3] After questioning this juror about the article at sidebar, I determined that he had not been prejudiced and I allowed him to continue to deliberate. I reminded the jury of their responsibility to decide the case solely on basis of the evidence admitted at the trial, and I repeated my instruction that they not read, watch or listen to anything related to the trial reported by the media. I then denied defense counsel's motions for a mistrial and to sequester the jury.

On September 13, 1988, the jury returned a verdict of guilty on fifty-six out of fifty-seven counts.[4] Defense counsel requested that the jury be polled individually for each count as to each defendant. Three jurors were polled in this fashion before defendants Nave and Sheehan waived polling on Counts 41–58, counts in which they alone were charged. Thereafter, each remaining juror was polled only as to Counts 1–40. The return of the verdict and polling lasted

---

2. They were provided with copies of the indictment and charge but not a trial transcript.

3. This is the same juror who later contacted Mr. Markham.

4. The two defendants named in Count 28 were found not guilty. In addition, defendant Nave was found not guilty on Count 40.

one and one-half hours. As to each defendant and each count, every juror responded "Guilty" except in three instances when they answered "Not Guilty." In all, there were a total of 1,314 individual responses. Just like the other jurors, the juror involved here was asked eighty-nine times for his verdict as to the various defendants. He responded "Not Guilty" three times, and "Guilty" eighty-six times.

Three days after the trial, the juror contacted Paul Markham. Mr. Markham informed me of the call and I ordered him to desist from initiating any contact with the juror without the Court's express permission. Shortly thereafter I called in all counsel and held a hearing. The juror, whose identity was not known to me, appeared and I interviewed him in the presence of all counsel pursuant to Fed.R.Evid. 606(b). The interview was tailored to comply with the rule and thus was narrow in scope. I asked the juror about jury predisposition towards guilt and about extraneous influences on the jury such as media reports.

Understandably, this juror appeared quite nervous. During the course of the interview, he disclosed that some of the post-verdict media coverage had upset him a great deal. He specifically mentioned being "unhappy" about an article concerning the owner of a gay bar who had instigated the investigation of these police officers. In response to my question about a presumption of guilt among certain jurors, he stated that jurors had been discussing the case throughout the trial, that some jurors had expressed the view that the defendants were guilty as early as the second day of the trial, and that one juror had commented that defendant Sheehan "was a crook." He felt that other jurors were not considering the defendants to be innocent and that this made him want to "get out of it" but that he thought he should stay in to "protect" the defendants. He also stated that these jurors' views did not sway his view of the evidence; he said he "tried to be objective on everything" and continued to take notes.

This juror also reported that one juror had circulated a *Boston Magazine* clipping containing a reference to defense counsel Cardinale. Although this juror did not read or discuss the article in the jury room, he knew it was about those attorneys who "take care of the Mafia" because he went out and purchased the magazine later. He also reported that earlier, other articles were circulated but he could not provide any details. He thought Mr. Cardinale was again mentioned in those articles but he was not sure.

As a result of this interview, I decided to interview the rest of the jury panel about the two major issues raised by this juror. All fifteen were interviewed using basically the same format as with the initial juror. First, I told them that it had been brought to my attention that there may have been newspaper or magazine articles circulated among the jury and I asked them to tell me if they had seen, read or discussed any articles. When it was appropriate, I followed up by asking if the article or discussion had influenced the way they viewed the ensuing evidence in the case when they returned to the courtroom. Second, I asked them whether there had been any remarks or discussion by the jury about the case before deliberations began. Again, I followed up on this question by asking whether any remarks or discussion had influenced the way they continued to view the evidence. All jurors were admonished not to discuss the inquiry with anyone.

Only six of fifteen jurors recalled hearing some remarks made about guilt, evidence or the character of the defendants. The following are excerpts of the affirmative responses to this question. Each number below represents a different juror.

(1) [Were there any such discussions that you heard?] "No. Well, I don't know if there were discussions but there may have been remarks, yes." [And what was the nature of those remarks? What were they specifically?] "Oh, something that maybe the evidence was showing that they were more apt to be guilty than not." [And was there any particular person mentioned as the one against whom the evidence might be

showing up?] "Probably Mr. Sheehan." [And was it a—and is that what you can best tell us, your best memory that there was some discussion about he was probably—the evidence showed that—] "It's so hard to remember exactly but I think that's how it went."

(2) [Were there any such discussions?] "Um, I'm trying to think now. Well, I guess there were a few remarks made." [What were those remarks and by whom?] "Um—" [Well, what were those remarks first of all?] "I'm trying think who—I don't remember now who—I guess it was to the effect that if someone had their hand in the cookie jar, they expect to get caught." [And as to which defendant did that pertain or was —] "To all of them. It was like a blanket remark." [And when did this take place?] "It was in the beginning of the trial I believe." [When? Can you be a little more specific?] "I really don't remember." [And do you remember who made the statement?] "No." [Was there any expression or any description of any individual as a crook or a thief or guilty or whatever?] "Ah, no, just that remark sticks in my head."

(3) [At any time was there any such discussion or were any such statements made?] "The only thing that I remember is about Sheehan signing the checks and he had already admitted that anyway. I heard that much." [And that was a discussion that—] "Not really a discussion. Just, you know, in passing sort of." [And tell us exactly what it was that he—] "That he had signed and cashed checks that were not in his name." [Yes. And you said something about he admitted that?] "That he had already admitted that he had signed those checks and cashed them." [Was there any expression about his character as a result of that or his guilt?] "No." [Did anybody say anything about him particularly?] "Just that is all I recall." [Okay. After that statement—when was that statement made?] "Oh, I don't know. It may have been after we heard his lawyer say that he had admitted to

it." [First day, second day of trial?] "Yeah, Yeah."

(4) [And the question I want to ask you is whether or not at any time during the trial, not the deliberations, did you or any juror make any such statements or discuss any such conclusions that you reached or that the jury had reached regarding any or all of the defendants?] "Every so often you hear a remark but that was just about what you hear anywhere, whether this was in the jury room or whether it was anywhere on the street or anywhere else. There was no concrete, anybody saying, you know, making a statement of fact." [Did anybody ever say, for example, that Sheehan was a crook or did you hear that statement made?] "No, I didn't hear that." [Did you hear anybody say something like these defendants got their hands caught in the cookie jar?] "No." [Did anybody ever say, well, the evidence against him is pretty strong, he's probably guilty?] "No." [Did anybody ever say—] "I've heard a remark that there was an awful lot of evidence here." [Yes. And when did that take place?] "Or words to that effect." [Yes. And during the course of that—when during the course of the trial did that occur?] "Oh, I couldn't actually say. Near the end." [Did it happen once or throughout the trial?] "Just once that I actually heard a statement of that." [And that's all the statements or remarks or discussion that you can recall?] "Um-hmm."

(5) [. . . did you or any other juror make any statements or discuss any conclusions as to the conclusions, opinions that have been reached as to any or all of the defendants?] "No." [Did anybody say or discuss a particular defendant and say something about that defendant's nature or that defendant's character or the evidence against that defendant and its strength?] "No, not what you would say that we would sit here and discuss it. Even if there was anything, it was quickly hushed up. Nobody went into it. We just said, you know, as we were, like, coming upstairs and, say, God, that looks, you know, and, that was as far as

it went." [Finish that. That looks what?] "That looks like, you know, a lot of evidence there. But that was just as the trial was going on for our own benefit. But that quickly, you know, then we start talking about the weather or anything like that. We never pursued any matter each day of trial like that if you want to say like that." [What I want to know, is you do say that during the course of the trial there may have been or were some remarks made about the evidence or that's a lot of evidence?] "No, not that deep. Not that deep. Just pertaining to a person who was on trial that day or at that time, might have said a few words but that it was quickly dropped. It wasn't carried like a conversation of anyone talking about it." [Can you tell me—can you give me just an example of what was said?] "Right at the very beginning, probably Mr. Sheehan, when he was brought on trial there; but otherwise on that—" [And what was said then?] "He had a lot of charges but that was about it. We more or less tried to figure what the counts were against him, you know, because we didn't fully understand it as it was just fresh to us. But that was quickly dropped. As the trial went on, it sort of like gelled in. But that was all. We didn't sit and discuss it or anything like that. If it was anything, it was about like a 20–second discussion. And that was it. Completely dropped." [Did all of the jurors take part in this?] "No. No. No." [Okay. Now, whatever was said, whatever remarks about Mr. Sheehan—] "Right." [—and about any other defendant or about any other evidence, was that—] "No, he was the only one I would say." [The only one?] "Because he was the first one, you know, I can remember there. And, you know, he seemed to have a large amount of charges against him. But, like I said, it was quickly dropped." [Okay.] "As we realize, you know, sit here and keep talking about it now, you know. It wasn't a discussion, put it that way."

(6) [... Do you recall any such statements being made, including if you—]

"I've heard lots of opinions over the trial—over the period of the trial. And as far as I'm concerned, that's about it. There were opinions, you know. A lot of people, you know, said how they felt about this and that, you know, or they discussed it. And someone would say, well, you know, you're not supposed to talk about that, you know. And it just ended like that. It just—everyone had their opinion basically, you know." [Was there a particular defendant about whom they voiced an opinion or, as I say, even yourself, voiced an opinion or all of them, all of the defendants?] "Um, I would say ... There was opinions about, you know, a few here and there, you know. But it was nothing that made, like a lasting impression on anyone, you know. It was just, like I said, we heard opinions about it. Everyone said, you know, this or that one, you know, I think, you know, he might be guilty of that but I'm not sure. I'd like to see more of this or that, you know, things of that nature. But nothing was really concrete, you know. It was just, you know, well, I think this and that, you know. And then someone would say, you know, don't talk about it, you know." [I just want to be a little more particular. Did anybody ever mention that Frank Sheehan was guilty or did you say Frank Sheehan was guilty or that he was a crook or that the defendants had their hands in the cookie jar or that the evidence looked like it was pretty strong or that there was a lot of evidence, those kinds of remarks?] "I think everyone thought that both cases were represented pretty well, defense and the prosecution. And I don't remember hearing any strong points about any one side that I heard, you know." [But there were some expressions throughout the trial. Jurors would voice an opinion about this defendant or that case or this case. And, I mean, this count or that charge or this—] "I can't really remember any specific defendant that might have been, you know, you know, somebody might have gave their opinion on. I mean, you know, pretty much. But I don't think, you know, it was just discus-

sion. You know, what do you think of this, what did you think of that. It wasn't like, he's guilty or, you know, probing questions, you know, what do you think about this or that, you know. I think, you know, he might have done this but I'm not sure, what do you think, you know, things like that."

No one corroborated the original juror's statement that someone had said "they're all guilty." Every single juror responded that whatever comments were made, it had not influenced the way they viewed the evidence.[5] Moreover, many jurors responded vehemently that they had "decided the case based on the evidence."

As to the *Boston Magazine* article, nine of the sixteen jurors had read or seen the short piece concerning Mr. Cardinale. Five jurors stated they had not read it. Of those who saw it or read it, six said it had been commented upon or discussed. However, several of the comments related only to the picture which accompanied the article. All jurors responded that it had not influenced the way they viewed the evidence in the case or how they viewed Mr. Cardinale or his client.

I now turn to an extended discussion of the specific issues presented by these events. The discussion is lengthy not because of the novelty of the issues, but because of their critical importance in this case.

## II.

The law governing post-verdict disclosures of alleged extraneous and prejudicial influences on the jury accommodates two fundamental but conflicting policies. *United States v. Howard,* 506 F.2d 865, 868 n. 3 (5th Cir.1975); *United States v. Miller,* 403 F.2d 77, 82 (2d Cir.1968); *see also McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915) ("When the affidavit of a juror, as to [jury] misconduct ... [is presented,] the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted

to testify as to what had happened in the jury room."); *United States v. Bailey,* 834 F.2d 218, 223–25 (1st Cir.1987). On one hand, substantial policy considerations support "the near-universal and firmly established common-law rule flatly prohibit[ing] the admission of juror testimony to impeach a jury verdict." *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 2745, 97 L.Ed.2d 90 (1987).

There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. *It is not at all clear, however, that the jury system could survive such efforts to perfect it.* Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post verdict scrutiny of juror conduct.

*Id.* 107 S.Ct. at 2748 (emphasis added) (citations omitted). The Supreme Court has supported this principle by repeatedly emphasizing "the necessity of shielding jury deliberations from public scrutiny." *Id.* at 2747.

[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a pri-

---

5. One juror said in response to the question about whether they had been influenced: "I don't think so but I did have it in the back of my head."

vate deliberation the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed.2d 1300 (1915) *quoted in Tanner*, 107 S.Ct. at 2747. The First Circuit shares this concern, observing that "the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as unbalanced trial results depending unduly on the relative resources of the parties." *United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985). Numerous other federal courts express similar fears.[6]

Alongside the policy of protecting jury deliberations from intrusive post-verdict inquiries, however, lies the defendants' constitutional right to a fair trial. The Sixth Amendment "guarantees that 'the accused shall enjoy the right to a ... trial, by an impartial jury ... [and] be confronted with the witnesses against him.'" *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) (per curiam). Because "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors ... [t]he failure to accord an accused a fair hearing [also] violates ... the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Due process requires only that a juror exposed to publicity be able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723, 81 S.Ct. at 1642. Both of these specific guarantees— the rights of an impartial jury and of confronting witnesses, as well as the more general assurance of due process—contribute fundamentally to our system of justice. The underlying theory of this system, according to Justice Holmes, is that "conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

To reconcile these conflicting policies, and to ameliorate the hardships inevitably created by rigidly enforcing the common law rule, the Supreme Court long ago recognized a limited exception to the rule barring inquiries into the validity of a jury

---

6. Speaking for the Second Circuit, Judge Friendly stated that an "[i]nquiry of jurors after a verdict seeks to impugn the validity of judicial action on the ground of misconduct of a member of the tribunal. The court has a vital interest in seeing that jurors are not harassed or placed in doubt about what their duty is and that false issues are not created." *Miller v. United States*, 403 F.2d 77, 82 (2d Cir.1968). The Third Circuit writes that the rule prohibiting juror testimony to impeach a jury verdict was formulated to "discourag[e] harassment of jurors by losing parties eager to have the verdict set aside ... [to] encourag[e] free and open discussion among jurors ... [to] reduc[e] incentives for jury tampering ... [to] promot[e] verdict finality ... [and to] maintain[ ] the viability of the jury as a judicial decision-making body." *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 148 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). The Fourth Circuit has held that "[i]f jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance." *Rakes v. United States*, 169 F.2d 739, 745 (4th Cir.), *cert. denied*, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948). The Seventh Circuit recently stated that "[a] fruitful exchange of ideas and impressions among jurors is thought to hinge heavily on some assurance that what is said in the jury room will not reach a larger audience. This exchange, however crude or learned, is important enough to preserve." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir.1987). The Eighth Circuit stresses that "[a] central purpose of the rule of juror incompetency is the prevention of fraud by individual jurors who could remain silent during deliberations and later assert that they were influenced by improper considerations." *United States v. Eagle*, 539 F.2d 1166, 1171 (8th Cir.1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977). The Eleventh Circuit notes that the rule "strikes a balance between protecting the defendant's right to a fair trial free from substantial juror misconduct, while protecting the legitimate interests of preventing the harassment of jurors, supporting the finality of verdicts, and preserving the community's trust in a system that relies on the decisions of laypeople." *United States v. Sjeklocha*, 843 F.2d 485, 488 (11th Cir.1988).

verdict.[7] Such an inquiry is permitted only in situations in which an "extraneous influence" is alleged to have prejudiced the jury. *Mattox v. United States*, 146 U.S. 140, 148–49, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892). Rule 606(b) of the Federal Rules of Evidence codified both the rule and the exception, providing that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether *extraneous prejudicial information* was improperly brought to the jury's attention or whether any *outside influence* was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. (Emphasis added).

Despite wide acceptance of this approach in federal courts, attempting to set forth with precision and in advance that which constitutes an extraneous influence upon a jury is an elusive and perhaps even futile task. *See, e.g., United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) ("there is no 'litmus paper test' for making such a determination"). The difficulty is rooted in the jury system itself:

> All must recognize, of course, that a complete sanitizing of the jury room is impossible. We cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or

their philosophies. These involve the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations. Nevertheless, while the jury may leaven its deliberations with wisdom and experience in doing so it must not bring extra *facts* into the jury room. In every criminal case we must endeavor to see that jurors do not [consider] in the confines of the jury room ... specific facts about the specific defendant then on trial.

*United States v. McKinney*, 429 F.2d 1019, 1022–23 (5th Cir.), *modified on rehearing*, 434 F.2d 831 (5th Cir.1970), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 97 L.Ed.2d 825 (1971). Not only is it unreasonable to expect "that each juror's mind be a *tabula rasa*," *United States v. Kelly*, 722 F.2d 873, 880 (1st Cir.1983), *cert. denied*, 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984), it may even be undesirable. The Supreme Court, for example, has never required that jurors be totally ignorant of the facts and issues involved at the outset of a trial. Instead, the Court has consistently recognized that because of

> swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43. Although trial courts must attempt to ensure that the integrity of a jury proceeding, once begun, is not jeopardized by unauthorized invasions, *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), few trials would pass constitutional muster if a new trial was required each time a juror was discovered in a potentially compromising situation. *Smith*, 455 U.S. at 217, 102 S.Ct. at 946. According to the First Circuit, "[a] court's

---

7. Judge Friendly thought that this exception represented "a pragmatic judgment how best to attempt reconciliation of the irreconcilable." *Miller v. United States*, 403 F.2d 77, 83 n. 11 (2d Cir.1968). *But cf. Tanner*, 107 S.Ct. at 2747

(noting that judicial investigations conducted because extrinsic influences allegedly taint jury deliberations "do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process").

best defensive weapon, if the jury is not to be sequestered, is a strong anticipatory warning prior to trial." *United States v. Concepcion Cueto,* 515 F.2d 160, 164 (1st Cir.1975). Nevertheless, because "[t]he safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible ... it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith,* 455 U.S. at 217, 102 S.Ct. at 946. Thus, the touchstone of decision in this case is not "the mere fact of infiltration of some molecules of extra-record matter" but rather "the nature of what has been infiltrated and the probability of prejudice." *McMann,* 435 F.2d at 818.

### A.

■ Before proceeding to evaluate the defendants' specific arguments in this case, the proper role for this Court in investigating post-verdict allegations of juror misconduct must be examined. The defendants believe that this Court's inquiry—which consisted of on-the-record interviews of all twelve jurors and four alternates over a two day period,[8] in the presence of but without the direct participation of counsel[9]—revealed egregious evidence of misconduct justifying a new trial or, alternatively, a formal evidentiary hearing. They argue that this Court should employ a rebuttable presumption test to determine whether the misconduct was prejudicial. Under their formulation of this test, any extraneous information which reached the jury is presumptively prejudicial unless the government demonstrates beyond a reasonable doubt that the information was harmless. *See United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984); *United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975). The defendants, however, cite no cases that apply this test to circumstances similar to the facts presented here. *Perkins,* while representative of a line of cases that apply the rebuttable presumption test, is easily distinguished. Cases like *Perkins* involve juries that actively considered, during deliberations, extra-record facts about the case before them. This unauthorized consideration of facts not in evidence has taken many forms. Jurors have consulted reference books, such as dictionaries, for help in understanding technical terms or concepts. They have taken unauthorized views of the scene that is the subject of a case. They have conducted independent experiments and investigations of claims they heard discussed in court. They have even removed tape from exhibits admitted in evidence to learn of the matters not in evidence that lay underneath. *Lacy v. Gabriel,* 732 F.2d 7 (1st Cir.), *cert. denied,* 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984) (unmasking not so unfair as to deny due process); *Lacy v. Gardino,* 791 F.2d 980 (1st Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986) (unmasking was harmless error and did not violate defendant's confrontation and cross-examination rights).

---

**8.** The jury foreperson was not available during this two day period, and thus was not interviewed until September 26, 1988.

**9.** After bringing the juror's allegations of prejudicial misconduct to the Court's attention, the defendants moved for permission to interview the jurors *ex parte,* without the presence of the Court. Based on the First Circuit's prophylactic rule barring "the post-verdict interview of jurors by counsel ... except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate," *United States v. Kepreos,* 759 F.2d 961, 967 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985), the Court denied the motion.

The defendants also sought permission to participate in the questioning of each juror. On the basis of its broad discretion to determine the extent and type of investigation warranted by the allegations, *United States v. Kelly,* 722 F.2d at 881, the Court denied the motion. *See also Neron v. Clemons,* 662 F.Supp. 854, 862 (D.Me. 1987), *rev'd on other grounds,* sub. nom. *Neron v. Tierney,* 841 F.2d 1197 (1st Cir.1988) (when investigating post-verdict allegations of juror misconduct, "[d]ue process does not require the court to permit counsel to examine or cross-examine the juror"). Nevertheless, after concluding its interview of each juror, defense counsel frequently suggested to the Court, in the juror's presence, additional follow up questions. The Court generally acceded to these requests and asked the suggested questions.

*Perkins* involved still another method of considering extra-record facts. During voir dire, a juror withheld from the court and counsel his personal knowledge of the defendant, and then used that knowledge to argue for conviction during the jury's deliberations. 748 F.2d at 1534. The trial court concluded that the misrepresentation was neither intentional nor prejudicial. The Eleventh Circuit determined that this was clearly erroneous and reversed, holding that the juror interjected into deliberations extrinsic information about the defendant that was not in evidence. *Id.* at 1533. Noting that "[t]hese comments were made before a jury which for many hours had remained hopelessly deadlocked, and were made by a juror who was outspoken in his belief that [the defendant] should be convicted," *id.* at 1534, the court found the likelihood of prejudice to be overwhelming. *Accord United States v. Howard,* 506 F.2d 865, 866 (5th Cir.1975) (prejudice found where juror's statement that "defendant had been in trouble two or three [other] times" was used to pressure two jurors during deliberations); *United States ex rel. Owen v. McMann,* 435 F.2d 813, 815 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) (in a *habeas corpus* proceeding, prejudice found where three jurors told others during deliberations that the defendant had been in trouble all his life; that he had been suspended from the police force; that he had bad character; and that his father always

got him out of trouble); *cf. United States v. Williams,* 809 F.2d 75, 80–81 & n. 2 (1st Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987) (in analyzing whether actual prejudice results from the introduction of extrinsic evidence to the jury, the government has the burden of demonstrating beyond a reasonable doubt that the information was harmless).

I have found no cases that apply the rebuttable presumption test in situations where juries have been exposed to media reports, but did not use that material in deliberating upon a verdict.[10] Indeed, in *United States v. Porcaro,* the First Circuit explicitly rejected as "without merit" the defendant's contention that the rebuttable presumption test should automatically apply in cases that attract substantial publicity. 648 F.2d 753, 757 (1st Cir.1981). Instead, the court held that "where the publicity appearing during the trial is neither inherently prejudicial nor unusually extensive, the defendant must assume the traditional burden of showing actual jury prejudice." *Id.* at 758.

The well established rule in the First Circuit is that "[w]hen a non-frivolous suggestion is made that a jury may be biased or tainted, the district court must undertake an adequate inquiry into whether the alleged tainting incident occurred and whether it was prejudicial." *United States v. Corbin,* 590 F.2d 398, 400 (1st Cir. 1979).[11] Although an adequate inquiry

---

**10.** The circumstances of this case bear no resemblance to those cases in which actual bias is assumed because of the pervasive and sensational publicity attending the trial. These so-called "media circus" cases have arisen when "the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom." *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980). *See also Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

**11.** In *United States v. Doe,* the First Circuit formally adopted a rule requiring district courts to investigate alleged misconduct by the jury, basing it on the test set forth by the Fifth Circuit in *United States v. McKinney. Doe,* 513 F.2d 709, 711–12 (1st Cir.1975), *quoting, McKinney,* 429 F.2d 1019, 1026 (5th Cir.1970). As applied, the

rule has some flexibility. *Neron,* 841 F.2d at 1202 ("[w]e have found no case which purports to lay down an iron clad rule necessitating posttrial interrogation upon demand of every juror in every circumstance"). The Eleventh Circuit also embraces a flexible version of the *McKinney* test. *See United States v. Barshov,* 733 F.2d 842, 851 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985) ("There is no *per se* rule requiring an inquiry in every instance"). The Tenth Circuit recently pointed out, however, that *McKinney* was modified on rehearing. *See United States v. Bradshaw,* 787 F.2d 1385, 1388–89 & n. 1 (10th Cir.1986), *citing McKinney,* 434 F.2d 831 (5th Cir.1970), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). Apparently *McKinney's per se* rule mandating a judicially supervised step by step investigation of alleged juror misconduct has neither been adopted, *see United States v. Martinez,* 604 F.2d 361, 364 (5th Cir.

must be made " 'adequacy' itself is a dynamic concept," and the technique for achieving it need not always be the same. *Neron*, 841 F.2d at 1201. The trial court therefore "has broad, though not unlimited, discretion to determine the extent and nature of its inquiry." *Id.* In the context of a juror's post-verdict allegations of jury misconduct, however, the trial judge's discretion must necessarily be circumscribed by Fed.R.Evid. 606(b). *See supra* Part II. A. Jurors may only be asked whether any " 'extraneous prejudicial information was improperly brought to [their] attention or ... any outside influence was brought to bear upon any juror.' " *United States v. Gerardi*, 586 F.2d 896, 898 (1st Cir.1978), *quoting*, Fed.R.Evid. 606(b). Any "further inquiry into the deliberations of the jury [is] not only not required, but ... improper." *Id.*

On this record, I believe the obligation to investigate and evaluate the alleged juror misconduct at issue here has been satisfied. In the presence of all counsel, I questioned the sixteen jurors to learn whether they were predisposed or influenced by extraneous information to find the defendants guilty. While I understand the concerns and anxiety of the juror who contacted defense counsel, I questioned him and all his fellow jurors carefully and thoroughly. Having done so, and having received their responses, I cannot understand the defendants' claim, put forward in one of their motions, that this procedure was "prejudicial to the defendants because it may hamper or impair the juror's state of mind if he is forced to communicate with the Court in the presence of Government counsel."

### B.

■ In *Marshall v. United States*, the Supreme Court observed that "[t]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Generalizations beyond that statement are not profitable, because each case must turn on its special facts." 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (citation omitted). With this instruction in mind, I turn to the questions raised by the presence of a magazine clipping and newspapers in the jury room during the course of this trial.

The juror who came forward with the misconduct allegation stated that an article clipped from the August, 1988 issue of *Boston Magazine* was "brought in [to the jury room] early in the trial and passed around." This juror did not know if any jurors discussed the subject matter of the article, and stated that he did not read or discuss the article until after the trial concluded and the jury was dismissed. Eight of fifteen fellow jurors, however, acknowledged reading or seeing the article during the trial. Five jurors stated that they did not read it.

The "article" in question is hardly an article at all. Rather it is a short piece, included in a part of the magazine devoted to such short subjects, purporting to identify the five "best and brightest" Boston lawyers involved in representing "wise guys." It reads as follows:

1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980), nor followed, *see, e.g.*, *United States v. Herring*, 568 F.2d 1099, 1104–06 (5th Cir.1978); *United States v. Chiantese*, 582 F.2d 974, 978 (5th Cir.1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979), by the Fifth Circuit. Instead, the Fifth Circuit now emphasizes that "the decision to hold a hearing to determine whether juror misconduct has occurred is within the sound discretion of the trial judge and ... [its] ruling will not be reversed unless it constitutes an abuse of that discretion." *Chiantese*, 582 F.2d at 978.

The Ninth and Tenth Circuits both reject the *per se* approach, instead relying on the discretion of the trial judge to determine the proper course in responding to the alleged misconduct. *See United States v. Hendrix*, 549 F.2d 1225, 1227–28 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *Bradshaw*, 787 F.2d at 1390; *United States v. Jones*, 707 F.2d 1169, 1173 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). The Ninth Circuit, in fact, cites the First Circuit decision in *Doe* to support the proposition that "it is within the trial court's discretion to determine *whether* and when to hold an evidentiary hearing on such allegations. If the judge orders an investigative hearing, it is within [the court's] discretion to determine its extent and nature." *Hendrix*, 549 F.2d at 1227, *citing Doe*, 513 F.2d at 712.

ALL IN THE FAMILY

It's a dirty job, but somebody has to run the bookies, the prostitutes, and the drug traffic in and around the city. Turf gets trampled and bullets fly.

But after the corpses bloom in the spring and the subpeonas are served, who you gonna call? Not some match-book lawyer. No way. The best and the brightest. A guy who understands Cosa Nostra words like don, capo, and consigliere.

The Reporter set out to find the guys the wise guys call when it's time to go to the legal mattresses. What follows is the wise guy's guide to legal representation.

*Anthony M. Cardinale,* 37, of Boston: Specializes in defending extortion and racketeering cases. Every troubled

[Cardinale photo omitted]

mobster in town kisses Cardinale's ring sooner or later. "Every made guy we pick up has Cardinale's name in his wallet," a federal law-enforcement source says. When Cardinale wasn't representing Gennaro Angiulo, he was helping "Fat" Tony Salerno fight his 29–count indictment in New York City. Now he's handling Vinnie "The Pinhead" Ferrara's appeal against the U.S. government.

[descriptions and photos of four other lawyers omitted]

As is apparent, the article makes no mention, directly or indirectly, of this case. None of the defendants is mentioned by name or even alluded to, including Mr. Cardinale's client, Mr. McCormick. Thus, the article is clearly not prejudicial on its face. Rather, the prejudice, if any, must result from inferences jurors might have drawn after reading it. Although the defendants fail to explain or analyze why this piece is prejudicial, relying instead on bald assertions that it is presumptively prejudicial, their argument would have to take the form of the following syllogism: the article states that Mr. Cardinale represents "wise guys" and "mobsters," who are presumably involved in criminal activity; Mr. Cardinale represents a defendant in this case;

therefore, the defendant must be involved in criminal activity. Of course, even accepting this reasoning would lead to the inference that only Mr. Cardinale's client failed to receive the benefit of an impartial jury. Thus the defendants must rely on still another inference. That is, because McCormick must be involved in criminal activity (because he is represented by a lawyer who represents mobsters), all of McCormick's co-defendants must also be involved in criminal activity.

Such speculative and attenuated reasoning about possible prejudice does not justify additional intrusive inquiries into the jury's work in this case, nor does it provide support for granting a new trial. *See Neron v. Tierney,* 841 F.2d 1197, 1203 (1st Cir.1988) (the defendant presented "evidence so sparse, a pyramiding of inferences so fragile, a thesis so speculative, as to envelop the bias/misconduct charge in a miasma of doubt"). I have reviewed those cases addressing the issue of juror prejudice resulting from media reports. As one would expect, given the Supreme Court's instruction in *Marshall,* 360 U.S. at 312, 79 S.Ct. at 1172, no hard and fast rule can be drawn from these cases as to what does or does not constitute prejudice that denies a fair trial. These cases, however, involved media reports that appear to be far more prejudicial than the incident at issue here. Nevertheless, in a substantial number of these cases it was determined that the defendant was not prejudiced by the exposure of some or all jurors to the report.

In *United States v. Solomon,* for example, six jurors admitted reading a Chicago newspaper article which twice referred to the defendant as a "reputed crime syndicate loan shark." 422 F.2d 1110, 1117 (7th Cir.), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970). The article, which appeared in the middle of the trial, also noted that another person had been named in the indictment along with the defendant, and that this person "was slain in gangland fashion." *Id.* The trial judge, after questioning each juror individually, determined that the defendant was not prejudiced by the article. The Seventh Cir-

cuit affirmed, noting that the article did not contain "massively inflammatory revelations of prior felony convictions, past criminal conduct, [or] admitted and alleged improprieties" typical of news accounts deemed to be prejudicial. *Id.* at 1118. The article did not describe "inadmissable evidence which was strongly probative of guilt," such as the televised confession at issue in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). *Id.* Finally, the article was distinguished from the situation in *Janko v. United States*, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (per curiam), where the trial court refused to investigate the jury's awareness of a news report in which "the defendant was not only referred to as a relative and former employee of a 'rackets boss,' but also was called a 'former convict' who had previously been found guilty of the same charges but was being retried." *Id.* at 1118–19 & n. 9.

Numerous First Circuit cases have held that juror exposure to media reports did not violate the defendant's right to trial by an impartial jury. *See, e.g., Jackson v. Amaral*, 729 F.2d 41 (1st Cir.1984); *United States v. Santiago–Fraticelli*, 730 F.2d 828 (1st Cir.1984); *United States v. Porcaro*, 648 F.2d 753 (1st Cir.1981); *United States v. DiCarlo*, 575 F.2d 952 (1st Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed. 2d 129 (1978). *Porcaro* is particularly relevant because it analyzes arguments which are strikingly similar to the claims advanced here.

The defendant in *Porcaro*, convicted of violating federal conspiracy and anti-racketeering laws, argued that frequent and relatively prominent *Boston Globe* articles about his trial "could not have failed to come to the attention of the unsequestered jury" and thus were prejudicial per se. 648 F.2d at 756. The First Circuit noted, however, that "the various articles contained no prejudicial characterizations of [the defendant], his reputation, prior acts, arrests, or convictions, nor any speculation as to his guilt or innocence.... The crux of [the defendant's] claim of prejudice appears to be that the articles implicitly linked [the defendant] and his co-defendants as members of the same alleged plot, and thereby impermissibly tainted [the defendant] with guilt by association in the mind of any jurors who read the articles." *Id.* The court held that this argument relied "solely on the presumption of prejudice and ... show[s] no indication whatsoever of actual prejudice, or even the likelihood of prejudice, resulting from the articles. Any claim of prejudice is thus purely speculative, based on the unsubstantiated assumptions that (1) at least one juror read one or more of the articles, (2) the juror was so influenced by the article as to lose partiality, and (3) the juror's bias was not dispelled by the court's repeated instructions to disregard such outside influences." *Id.* at 758.

*Porcaro* disposes of both of the defendants' arguments concerning potentially prejudicial publicity. The notion of guilt by association, which is the only possible theory supporting the defendants' argument about the *Boston Magazine* article, was categorically rejected by the First Circuit as "purely speculative." *Id.* Although nine jurors acknowledged reading or seeing the article, there is no evidence suggesting that any of them was so influenced by it as to lose impartiality, nor is there evidence suggesting that any resulting bias was not dispelled by this Court's repeated admonitions to decide this case solely on the basis of the evidence admitted at trial. The defendants' second argument, which concerns the presence of newspapers in the jury room, is even weaker. Not only is there no evidence suggesting that any (or all) of the newspaper coverage of the trial prejudiced the jury, the defendants' failure to raise this issue as the publicity arose forecloses them from raising it now. *Id.* at 757. I asked the jury about their exposure to newspaper articles whenever counsel suggested that I do so. *See United States v. Perrotta*, 553 F.2d 247, 251 (1st Cir.1977). In addition, at various times throughout the trial I admonished the jury not to read, watch, or listen to media reports related to the case. With one exception, the defendant's never objected to my instructions nor

suggested a different course.[12]

## C.

■ The impartiality requirement of the 6th Amendment requires a jury each of whose members is willing and able to decide a case based solely on the evidence introduced at trial and the instructions of the court. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Medina,* 761 F.2d 12 (1st Cir. 1985). Any preconceived notion about the guilt or innocence of a party does not rebut the presumed impartiality of a juror as long as he or she can set aside that opinion and render a verdict based on the evidence. *Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642. *See also Patton v. Yount,* 467 U.S. 1025, 1037 n. 12, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984); *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *United States v. Moreno Morales,* 815 F.2d 725 (1st Cir.), *cert. denied,* ─── U.S. ───, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987). The question in this case is whether any juror during the course of trial formed such a strong opinion of guilt or was so affected by other jurors' opinions as to the guilt or character of the defendant that they failed to keep an open mind and render a verdict based on all the evidence. This finding is one for the trial judge based on his appraisal of jurors' continued impartiality. *United States v. Mirkin,* 649 F.2d 78, 82 (1st Cir.1981). *See, e.g., United States v. Anello,* 765 F.2d 253, 258 (1st Cir.), *cert. denied,* 474 U.S. 996, 106 S.Ct. 411, 88 L.Ed.2d 361 (1985); *United States v. Kelly,* 722 F.2d 873 (1st Cir.1983), *cert.*

*denied,* 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984).

Jurors may make statements about the case yet keep their minds open to the remaining evidence and give the defendant a fair trial. *See, e.g., Grooms v. Wainwright,* 610 F.2d 344 (5th Cir.), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed. 2d 789 (1980) (Trial judge did not err in refusing to interrogate jurors about one juror's statement "from what I heard he's already guilty" made after close of the prosecution's case because statement did not reflect serious prejudice but only objective evaluation of evidence to date); *United States v. Chiantese,* 582 F.2d 974 (5th Cir. 1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979) (court did not err in refusing to hold a hearing when after a particular cross examination a juror remarked to other jurors about the attorney "Stupid. Stupid. Stupid. He's a pain in the ───" because the remark did not indicate partiality); *United States v. Klee,* 494 F.2d 394 (9th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974) (no mistrial warranted when one juror states by affidavit that nine of the jurors expressed opinions as to guilt before the close of the case, given jury's impartiality evidenced by their request for re-reading of court's instructions on sole issue in the case). The important thing is not that jurors keep silent about the case but that each juror keeps an open mind until the case has been submitted to the jury. *Klee,* 494 F.2d at 396.

Although there may be some question of whether under Fed.R.Evid. 606(b) a judge may even inquire as to the affect of these statements on the minds of fellow jurors,[13]

---

**12.** The exception concerns the newspaper article about the speech made by the chief of the Organized Crime Strike Force, discussed *supra.* Like the *Boston Magazine* piece, this article neither directly nor indirectly referred to the defendants or to this case. In the presence of counsel, I questioned the one juror who stated that he had read the article and concluded that he was not prejudiced. For that same reason, I denied the defendants' motion for a mistrial. I also denied the defendants' motion to sequester the jury. I chose not to order sequestration in part because this article appeared while the jury was in the midst of deliberations. Such a measure

would have been likely to arouse extreme speculation and curiosity amongst the jury, thereby causing more problems than it possibly could solve. *See generally Mastrian v. McManus,* 554 F.2d 813, 819 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977) (sequestration is "one of the most burdensome tools of the many available to assure a fair trial").

**13.** *Mattox v. United States,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) ("a juryman may testify to any facts bearing upon the existence of any extraneous influence, although not

it is also entirely possible that those jurors who hear these statements may not be influenced in a way that prejudices the defendant. *See, e.g., Anello,* 765 F.2d 253 (there was no prejudice to defendant warranting a mistrial when one juror remarked after prosecutor's closing argument that "they're all guilty anyway" when that juror and those in near vicinity were removed from the case and despite the fact that other remaining jurors may have heard the statement or resulting discussion); *Kelly,* 722 F.2d 873 (no error in trial judge's assessment of jury impartiality through questioning conducted after it was reported that one juror had expressed opinions of guilt to others and that juror was removed); *United States v. Doe,* 513 F.2d 709 (1st Cir.1975) (no deprivation of a fair trial when, among other events, a juror displayed disgust with the court's ruling by turning his back to the court because that juror was replaced and other jurors were polled as to effect and deemed to be impartial); *Milam v. United States,* 322 F.2d 104 (5th Cir.1963), *cert. denied,* 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964) (no mistrial warranted by a statement made by one juror to two other jurors during a recess, that if he were a witness he would sue that defense lawyer for the way he was harassing witnesses, when that juror was discharged and two listening jurors made no reply); *United States v. Homer,* 411 F.Supp. 972 (W.D.Pa.), *aff'd,* 545 F.2d 864 (3d Cir.1976), *cert. denied* 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977) (no improper influence was shown when a prospective juror remarked that he had heard that the defendants were "just a lot of racketeers" because matter was dropped after original occurrence, there was no evidence that the prospective juror harbored this view himself or that any impaneled jury member held these thoughts or replied untruthfully when questioned about impartiality).

■ Defendants' allegations of bias based on the mere fact that jurors made remarks do not overcome the strong presumption that the jurors followed my instructions and kept an open mind. As the Supreme Court said almost 100 years ago:

> It must be made clearly to appear that upon the evidence the court ought to have found the juror had favored such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the trial judge.

*Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

After consideration of the entire record, I believe this jury was and remained impartial throughout the trial. The jurors I interviewed had not closed their minds to the evidence. I do not base this decision only on their own denials of bias, although I did observe their demeanor during voir dire and these interviews. There are still other factors that lead me to this conclusion. First, only seven out of sixteen jurors recalled even hearing any remarks made about the case and only two said there had been "discussion." No juror corroborated the original juror's account that some had

as to how far that influence operated upon his mind. Nor is evidence competent which relates to the thought processes and undisclosed subjective prejudices of individual jurors" quoting *Woodward v. Leavitt,* 107 Mass. 453 (1871)); *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 149, 150 (3d Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) ("evidence of discussion among jurors, intimidation or harassment of one juror by another, and other intrajury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict"); *Smith v. Brewer,* 444 F.Supp. 482 (S.D. Iowa), *aff'd* 577 F.2d 466 (8th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978) (quotes with approval above language from *Ger-*

*eau* ); *U.S. v. Kimberlin,* 527 F.Supp. 1010 (S.D. Ind.1981), *aff'd,* 805 F.2d 210 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987) (effect on jury panel of juror statement "They ought to hang him now so we can all go home" may not be the basis of a motion for a new trial because you may not inquire into thoughts and reactions of jurors). I read these cases and the rule to apply to the subjective mental processes of the jurors as regards the ultimate verdict and not how they continued to view the evidence. Still, I recognize that this distinction is subtle. If the rule is read to forbid the inquiry I made then it certainly supports my ruling not to inquire any further into these matters.

said "they're all guilty" on the second day of trial. There was simply no remark recounted which reflected a fixed opinion or which would have influenced any other juror to close their mind to the remaining evidence. Second, the jurors were attentive and most appeared to take notes throughout the trial. As stated earlier, the jury was alerted to the conflicting theories by opening statements of some counsel, namely whether the payments were extortion or gifts, and the evidence that followed was consistent with those theories. Third, they deliberated for thirty-five hours over five and one-half days. They reviewed a great deal of evidence, including audiotapes and videotapes of some of the meetings with some of the defendants. They asked questions which indicated their attention to the details and evidence in this case. *See, supra* p. 379. In my judgment, the jury performed its difficult and arduous duty in the faithful, conscientious and courageous manner demanded by our jury system.

Justice Woodbrough, dissenting in *Winebrenner v. United States*, 147 F.2d 322 (8th Cir.), *cert. denied*, 325 U.S. 863, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945), said "[n]o normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters." *Id.* at 330. The question is not silence but is always whether the jury continued to view the evidence with an open mind. Nothing in their interviews or in their behavior during the trial leads me to the conclusion that this jury based their verdict on anything but the evidence. As Judge Kass so aptly put it: "[A]lthough the mouths of some of the jurors may have been too open their minds were not shut." *Commonwealth v. Scanlan*, 9 Mass.App. 173, 184, 400 N.E.2d 1265 (1980).

### III.

A jury reflects the attitudes and mores of the community from which it is drawn. It lives only for a day and does justice according to its lights. The group of twelve, who are drawn to hear a case, make the decision and melts away. It is not present the next day to be criticized. It is the one governmental agency that has no ambition. It is as human as the people who make it up. It is sometimes the victim of passion. But it also takes the sharp edges off a law and uses consciences to ameliorate a hardship. Since it is of and from the community, it gives the law an acceptance which verdicts of judges could not do. Justice William O. Douglas, *Almanac of Liberty* 112 (1954).

In accordance with the foregoing, I conclude that the evidence in this case was fairly and impartially considered by a fair and impartial jury. The defendants' motion for a new trial, with its incorporated request for an evidentiary hearing, is denied.

SO ORDERED.