## COMMONWEALTH vs. LUKE F. SCANLAN.

Hampshire. October 19, 1979. — February 14, 1980.

Present: GOODMAN, ROSE, & KASS, JJ.

*Jury and Jurors. Constitutional Law*, Jury. *Search and Seizure. Probable Cause. Evidence*, Business record, Absence of fact, Relating to deliberation by jurors. *Practice, Criminal*, Conduct of juror, Deliberation of jury.

Motions to dismiss indictments on the ground that the process by which the grand and petit jury pools were selected excluded women and persons under age forty were properly denied, where the contention that women were insufficiently represented was meritless and where the judge, on the basis of material submitted as an agreed statement of facts, was warranted in finding no factual basis for the proposition that persons under forty were underrepresented on either panel. [175-178]

Allegedly improper use of polygraph test results to substantiate the reliability of an informant cited in an application for a search warrant was not a ground for suppression of evidence seized pursuant to the warrant where the affidavit set out other facts sufficient to establish the informant's reliability, including his identity as a former police officer with whom the defendant participated in the alleged crimes, other details of the crimes, and the defendant's location at the time each crime was committed. [178-180]

Failure of an affidavit in support of a search warrant to mention inducements made to the informant relied upon in the affidavit was not a ground for suppression of evidence seized pursuant to the warrant, in the absence of evidence suggesting a deliberate misrepresentation. [180]

An affidavit in support of an application for a search warrant, given ten months after the time when the informant named therein had last seen the article to be seized at the defendant's place of business, was not, in the circumstances, so stale as to require that the article be suppressed from evidence. [180-181]

At the trial of numerous indictments charging breaking and entering a building and larceny in a building the judge properly permitted a chief of police to testify, on the basis of his examination of duty records, concerning the dates the defendant, a former police officer, and another

police officer had not worked together, without requiring the witness to produce the duty records themselves. [181-182]

Where certain comments by jurors among themselves, if proved to have occurred, would not have required their verdicts of guilty to be set aside, no error appeared in the judge's refusal to interrogate the jurors. [182-184]


INDICTMENTS found and returned in the Superior Court on November 9, 1977.

A pretrial motion to suppress evidence was heard by *Greaney*, J., and the cases were tried before him.

*William C. Newman* for the defendant.

*Stephen R. Kaplan*, Assistant District Attorney (*Bernard J. Whalen, Jr.*, Assistant District Attorney, with him) for the Commonwealth.

KASS, J.  From conviction on thirteen counts of breaking and entering a building in the nighttime with intent to commit a felony and nine counts of larceny in a building, the defendant Scanlan appeals pursuant to G. L. c. 278, §§ 33A-33G.  These offenses occurred over a period of twenty-six months, during which Scanlan served as a police officer in Northampton.  Scanlan raises issues concerning selection of the jury, the failure to suppress certain evidence, and misconduct by certain members of the jury.  As to the last issue, this appeal is from the denial of a motion for a new trial.

1. *Jury selection.*  Scanlan moved before trial to dismiss the indictments on the ground that the process by which the grand jury and petit jury pools were selected intentionally and systematically excluded a disproportionate number of women and persons between the ages of eighteen and thirty-nine.  For purposes of the hearing on that motion the parties filed a statement of agreed facts incorporating the transcript of evidence, exhibits, briefs, and the decision in *Commonwealth* v. *Blutstein*, a Superior Court case in Hampshire County (Docket Number 10939) in which, about two years earlier, identical challenges to selection of the jury had been made.  In that case the judge — after extensive hearings — ruled that "[t]he defendants have failed

to sustain the burden of proving that in the selection of . . . jurors . . . there was a systematic or a deliberate or a purposeful or a consistent discrimination against or exclusion of women as a group, or of persons under the age of . . . 39 as a group." As to the status of those findings we shall have more to say later in our consideration of the contention that the jury pool contained disproportionately few persons below the age of forty.

(a) *Underrepresentation of women.* The contention that women were insufficiently represented in the grand jury and traverse jury pools edges to the brink of frivolity. Fifteen of the twenty-three members of the jury which indicted Scanlan were women. Of the jurors summoned to jury duty in Hampshire County in 1975-1976, women constituted 42.5%; in 1976-1977 44.1%; and in 1977-1978 44.6%. The defense posits (and we accept for purposes of analysis) that in these periods women composed 55% of the population of Hampshire County and argues from that figure that they are underrepresented in the jury pool. While *Taylor* v. *Louisiana*, 419 U.S. 522 (1975), struck down a statute that exempted a woman from jury duty unless she volunteered in writing to serve, the court warned that the decision was not to be read as imposing a "requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. While a true cross section is the ultimate ideal, it is by no means the constitutional mandate. *United States* v. *Butera*, 420 F.2d 564, 572 (1st Cir. 1970). See *Commonwealth* v. *Soares*, 377 Mass. 461, 481-482, cert. denied, 444 U.S. 881 (1979). The constitutional policies are, in the final analysis, qualitative, not quantitative, and a requirement of precise arithmetical equivalences would assure a duel of statisticians as an overture to any trial. What is to be avoided is distortion. For example, in *Taylor* v. *Louisiana, supra* at 524, women made up two thirds of one percent and zero percent of the jury pool in successive years, a deviation so extreme as to signal systematic exclusion.

(b) *Underrepresentation of persons under age forty.* On appeal, the defendant focuses not on whether the class he selected, those aged eighteen to thirty-nine, was in fact systematically underrepresented, but whether it constitutes a cognizable group for purposes of a constitutional challenge to the jury selection process. The trial judge ruled that it was not a cognizable group, noting the arbitrary limits of that age grouping and that within any age group there will be vast variation in attitudes, viewpoints and experiences.[1]

However, we need not resolve the question whether the eighteen to thirty-nine class is a cognizable group since the judge, having reviewed the *Blutstein* record and affidavits submitted by counsel in the instant case, found no factual basis for the proposition that persons under the age of forty were in fact underrepresented on either panel in Hampshire County. That finding is entitled to substantial deference by an appellate court. *Commonwealth* v. *White,* 374 Mass. 132, 138 (1977), aff'd 439 U.S. 280 (1978). *Commonwealth* v. *Taylor,* 374 Mass. 426, 431 (1978). Having ourselves reviewed the *Blutstein* materials, which are detailed and extensive, we have no difficulty in concluding that they support the judge's finding.

Of at least equal significance were the judge's findings that the jury selectors in Hampshire County "made conscientious efforts to acquire women and young people for jury service"; that "[i]n almost all of the towns, jury selec-

---

[1] For references to a class of persons under age twenty-five, see *Commonwealth* v. *Lussier,* 364 Mass. 414, 423-424 (1973); *Commonwealth* v. *Peters,* 372 Mass. 319, 321-322 (1977). For the view that a larger age classification (age twenty-one to age thirty-four) constitutes "a cognizable — though admittedly ill-defined — group for purposes of defendant's prima facie case" see *United States* v. *Butera,* 420 F.2d at 570. For a discussion of what constitutes a cognizable group, see *United States* v. *Guzman,* 337 F.Supp. 140, 143-144 (S.D.N.Y.), aff'd 468 F.2d 1245 (2d Cir. 1972), cert. denied, 410 U.S. 937 (1973). For a useful analysis of jury selection decisions in the Federal courts see the appendix to *Foster* v. *Sparks,* 506 F.2d 805, 813-837 (5th Cir. 1975), especially the review of challenges based on discrimination against a particular age grouping at 823-824.

tion was done at 'random' without 'distinction as to sex or age'"; and that "jury selection procedures were fair, balanced and designed to produce a representative jury and grand jury." Neither the Constitution of the United States nor of Massachusetts, as we earlier observed in connection with the defendant's claim of underrepresentation of women in the jury pool, requires that each jury actually chosen represent a cross section of the population. *United States* v. *Butera*, 420 F.2d at 567-568. The constitutional mandate is that the jury selection procedures be fair and nondiscriminatory. *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 220 (1946). Thus, even if a challenging party persuades a judge that a jury or jury pool is statistically askew, that aberration must be the result of a selection system rigged to exclude identifiable groups.[2] If the jury selection system is reasonably designed to yield a fair cross section of the population, the system is valid even if it is less than perfect. *Swain* v. *Alabama*, 380 U.S. 202, 209 (1965). It is the burden of the government to establish the fairness of the system, if the jury pool is statistically distorted. *United States* v. *Butera, supra* at 570.

The defendant argues that the *Blutstein* transcript and exhibits were offered solely to aid the judge in deciding the question of law, but this is not what appears from the record.[3] When those materials were submitted by defense counsel, the following colloquies took place:

MR. NEWMAN (defense counsel): "To the extent that the Court might find it useful or instructive to review

---

[2] For example, limiting the list to personal acquaintances of the jury commissioners, resulting in exclusion of blacks, *Smith* v. *Texas*, 311 U.S. 128, 131-132 (1940); women chosen only from a list of members of the League of Women Voters, *Glasser* v. *United States*, 315 U.S. 60, 83-86 (1942); exclusion of day laborers, *Thiel* v. *Southern Pac. Co.*, 328 U.S. 217, 220-222, 224-225 (1946).

[3] Were we to accept the defendant's limitations, we would be faced with an abstract question on which we would hesitate to make a determination.

any part of that record, the defense certainly has no objection to the Court's reviewing that; but certainly, on the other hand, we are not advising the Court to do so if the Court would feel comfortable in adopting Judge Tisdale's [the judge in *Blutstein*] findings." ·

\* \* \*

THE COURT: "Now, do you want to argue or just leave it to me to read all this information and briefs and records and so forth; and decide the motion one way or the other?"
MR. NEWMAN: "That would be sufficient with the defense, your Honor."

Obviously the judge thought he was to make a finding whether persons under forty had in fact been systematically excluded from the jury pool, because he made precisely such a finding. The defense made no objection to that finding of fact or motion to strike it from the judge's decision.

2. *Motion to suppress physical evidence.* Before trial, the defendant unsuccessfully sought to suppress a sledge hammer used to force entry in several of the burglaries. The defendant's attack is directed at the reliability of the informant cited in the affidavit upon which the search warrant was issued. That affidavit, in turn, led to seizure of the sledge hammer. The informant's reliability, the defendant urges, was not adequately substantiated because: (a) polygraph test results were improperly used to establish reliability; (b) the affidavit did not set forth promises, rewards, and inducements made to the informer in exchange for his information; and (c) there were no other facts corroborating the informant's reliability. In addition, he argues that the affidavit failed to establish probable cause because the information in the affidavit was stale. There was no error.

The two-pronged test developed by the United States Supreme Court for evaluating affidavits used as a basis for search warrants requires that the affidavit set forth some of

the underlying circumstances from which the affiant concluded that the informant was reliable and some of the underlying circumstances from which the informant concluded that the defendant was engaged in criminal activity. See *Aguilar* v. *Texas*, 378 U.S. 108, 112-116 (1964); *Spinelli* v. *United States*, 393 U.S. 410, 415-416, 419 (1969); *United States* v. *Harris*, 403 U.S. 573 (1971); *Commonwealth* v. *Stewart*, 358 Mass. 747, 750 (1971); *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 252 (1974). In applying this test to a particular affidavit, the affidavit is to be interpreted in a common sense fashion and not subjected to hypertechnical scrutiny. *Stewart, supra* at 750. It must be examined as a whole, *Commonwealth* v. *Moran*, 353 Mass. 166, 170 (1967), to determine if probable cause existed to issue the warrant; not if there was evidence of guilt beyond a reasonable doubt. *United States* v. *Harris*, 403 U.S. at 584.

An examination of the affidavit reveals, apart from the results of the polygraph test, sufficient information to uphold the magistrate's finding of informant reliability. It was not necessary for the affiant to allege that the informant was believed to be reliable. *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. at 253. "The specificity of the information supplied, the affiant's occasion to question the informant, and the fact that the informant was named and was not a paid informer" may supply sufficient indicia of reliability. *Id.* The informant here was a former police officer, fully identified in the affidavit, who participated in the crimes with which Scanlan was charged. See *Commonwealth* v. *Harvey*, 6 Mass. App. Ct. 887 (1978). In that regard he is in a different category from the professional informant whose identity may be unknown and whose ability to deal with the subject matter of crimes is more questionable. Cf. *United States* v. *Melvin*, 596 F.2d 492, 497 (1st Cir. 1979).

The informant, as set out in the affidavit, gave detailed description of several crimes which he and the defendant had allegedly committed and the facts of which were independently corroborated by the affiant through police reports and records. See *Commonwealth* v. *Lotfy*, 8 Mass.

App. Ct. 126, 130-132 (1979). Added to that information in the affidavit was the fact that the informant and Scanlan at the time all of the burglaries took place were partners on cruiser duty in the vicinity of each of the crimes.

Thus, as the trial judge observed, the reliability of the affidavit was established without reinforcement from the polygraph examination of the affiant to which the defendant objects, and there is no need to consider whether the polygraph tests were properly used.[4]

As to the defendant's second objection to the supporting affidavit, that it failed to mention inducements made to the informant Roy for the information referred to in the affidavit, there is no evidence in the record suggestive of a deliberate misrepresentation in the affidavit on this score. *Commonwealth* v. *Reynolds,* 374 Mass. 142, 147 (1977). *Commonwealth* v. *Kinnitt,* 2 Mass. App. Ct. 810 (1974). See *Franks* v. *Delaware,* 438 U.S. 154, 171-172 (1978). As factors of blameworthiness shade off from deliberate misrepresentation, so do the grounds for suppression. *Commonwealth* v. *Reynolds, supra* at 146. We do not agree that the failure to set forth promises and rewards to Roy rendered the affidavit misleading to the magistrate to whom it was presented. Evidence of such inducements would not per se render the informant so unreliable as to torpedo the basis for a finding of probable cause. There is no burden on the applicant for a search warrant to furnish in the supporting affidavit material which might later prove useful to the defense. *United States* v. *Averell,* 296 F.Supp. 1004, 1018 (E.D.N.Y. 1969). *United States* v. *Lewis,* 425 F.Supp. 1166, 1173 n.19 (D. Conn. 1977).

Staleness of the supporting affidavit is the basis for the third and last attack on the search warrant which led to the sledge hammer. Ten months had gone by between the date

---

[4] In *Baker* v. *Lawrence,* 379 Mass. 322, 327-328 (1979), the Supreme Judicial Court recently determined that the standards set forth in *Commonwealth* v. *A Juvenile,* 365 Mass. 421 (1974), and its progeny for the admission of polygraph test results in the trial of criminal cases do not apply to certain investigatory procedures.

of the affidavit and the time when Roy had last seen the sledge hammer at Speed City, a shop Scanlan operated when off duty. As was the case in *Commonwealth* v. *Fleurant,* 2 Mass. App. Ct. at 254-255,[5] the affidavit and warrant referred to another item (a stolen scanner radio) which Roy had seen within three months of his affidavit.[6] Moreover, the informant here provided abundant details of the modus operandi employed in a series of crimes over a period of two years. Factors such as the nature of the criminal activity under investigation and the nature of the evidence sought have a bearing on what constitutes excessive remoteness. *United States* v. *Dauphinee,* 538 F.2d 1, 5 (1st Cir. 1976). As the trial judge noted, the sledge hammer and the other tools had been used in a continuing pattern of criminal conduct. See *Commonwealth* v. *Vynorius,* 369 Mass. 17, 25 (1975). They were also the sort of items which "would likely remain in the possession of the suspect in connection with his business or personal affairs." 1 LaFave, Search and Seizure § 3.7, at 688 (1978).

3. *Police chief's testimony.* Through the testimony of Daniel Labato, acting chief of police for the Northampton police department, the Commonwealth introduced police department rosters, which Labato testified were kept in the regular and ordinary course of business, with entries made at or about the date of the event, which were true and accurate as far as he knew, and which were made and kept in good faith. G. L. c. 233, § 78. These records showed a remarkable correlation between the nights Scanlan and Roy worked as cruiser partners and the nights when breaks occurred on their beat.

---

[5] In which observations made by an affiant thirteen months before were found sufficiently fresh.

[6] For examples of the signal failure with which the claim of staleness of supporting affidavits has met, see *Commonwealth* v. *Ellis,* 356 Mass. 574, 577-578 (1970); *Commonwealth* v. *Guerro,* 357 Mass. 741, 755 (1970); *Commonwealth* v. *Misci,* 358 Mass. 804 (1970); *Commonwealth* v. *Fleurant,* 2 Mass. App. Ct. 254-255; *Commonwealth* v. *Blye,* 5 Mass. App. Ct. 817 (1977); *United States* v. *Mustone,* 469 F.2d 970, 973 (1st Cir. 1972).

Labato further testified that he had examined all daily work sheets of the police department over the two-year period of time during which the majority of breaks occurred, and had found that Scanlan and Roy did not work together during the last part of 1974, except for one night. On that night a break occurred. During 1975, seven of the breaks for which Scanlan was indicted took place on nights when he and Roy were on duty together, and on only two nights that they worked together did breaks not take place. In 1976, they worked together when eight breaks covered by the indictment occurred, and again on only two nights that they worked together did breaks not take place.

As we understand the defendant's objection, it is not to the admission of the roster entries which showed when he and Roy had worked together; it is only to allowing Chief Labato to testify as to when Scanlan and Roy had *not* worked together on the basis of his examination of all the duty records from October 20, 1974, to the end of December, 1976. Labato did not bring those records with him, and the defendant protests that in the absence of the records as a basis for cross-examination by the defense, Labato's testimony was not admissible.[7] The applicable rule of evidence is to the contrary. A witness may testify that he has examined records and not found a particular entry or entries. "In these circumstances the proof of the fact that an entry does not exist does not require the production of the records themselves or the laying of a foundation for the introduction of secondary evidence." *Commonwealth* v. *Torrealba,* 316 Mass. 24, 30 (1944). See also *Cohen* v. *Boston Edison Co.,* 322 Mass. 239, 241 (1948); *Johnson* v. *Wilmington Sales, Inc.,* 5 Mass. App. Ct. 858 (1977). Leach & Liacos, Massachusetts Evidence 313-314 (4th ed. 1967).

4. *Jury misconduct.* Approximately one week after the trial, the defense moved for a voir dire examination of the jurors and for a new trial on the basis of information fur-

---

[7] The defendant did not during or before Labato's testimony make demand for the daily sheets.

nished by Linda Rozolsky, an alternate juror, that during the presentation of evidence and prior to the court's charge certain members of the jury had discussed the case among themselves despite repeated instructions by the court not to talk about the case with one another. A supporting affidavit from defense counsel alleged that one juror expressed his conclusion to two others that Scanlan was guilty. On a separate occasion one juror (not involved in the first conversation) said to another, "Why doesn't he just get up and plead guilty and save us all the time and money?" On a third occasion, a juror told Rozolsky that she was leaning towards a guilty verdict. Rozolsky declined to make an affidavit.

It is the defendant's position that, if proved, these conversations among jurors deprived him of his right to a fair and impartial trial and required that the verdicts be set aside. See *Commonwealth* v. *Theberge,* 330 Mass. 520, 530 (1953). See also *Commonwealth* v. *Haywood,* 377 Mass. 755, 769 (1979). Therefore, the court's refusal to interrogate the jurors, the defense insists, was error. The defendant has been industrious in making available to us authority concerning the psychological dynamics of groups for the purpose of demonstrating how damaging to the defendant expressions of opinion could be within a jury.

After *Commonwealth* v. *Fidler,* 377 Mass. 192 (1979), however, there is less to the defendant's jury misconduct argument than meets the eye. It is the presence of extraneous influences that may impeach a jury verdict, not matters relating to the jury's internal decision making. *Id.* at 198-199.

This is not a case in which external factors — such as pretrial publicity, *Commonwealth* v. *Mascolo,* 6 Mass. App. Ct. 266, 279-280, cert. denied, 439 U.S. 899 (1978); unauthorized views by the jury, *Harrington* v. *Worcester, Leicester, & Spencer St. Ry.,* 157 Mass. 579, 581-583 (1893); facts communicated by a third party, *People* v. *Hutchinson,* 71 Cal. 2d 342, 349-351, cert. denied, 396 U.S. 994 (1969); or discussions between jurors and nonjurors, *Commonwealth* v. *Theberge,* 330 Mass. at 528-530, *United*

*States* v. *Pierce,* 593 F.2d 415 (1st Cir. 1979) — might have affected the jury's ability to deliberate with impartiality. See *United States* v. *Klee,* 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835 (1974). In such a case the trial judge might be required to hold a hearing. *Commonwealth* v. *Fidler, supra* at 200. *United States* v. *Rhodes,* 556 F.2d 599, 601-602 (1st Cir. 1977). *United States* v. *Chiantese,* 582 F.2d 974, 979 (5th Cir. 1978), cert. denied sub nom. *Cerrella* v. *United States,* 441 U.S. 922 (1979). *United States* v. *Pierce,* 593 F.2d at 419.[8] While the internal discussion among jurors in the face of daily instructions from the judge to the contrary was undesirable, *Commonwealth* v. *White,* 147 Mass. 76, 80 (1888), we would embark on a slippery slope indeed if we began to monitor and evaluate the internal procedures of the jury. For this reason, testimony of a juror concerning jury deliberations may not be received by a trial judge. *Commonwealth* v. *Meserve,* 156 Mass. 61, 62 (1892). See *Carzis* v. *Hassey,* 6 Mass. App. Ct. 13, 16 (1978). The jury sat sequestered for sixteen days; it is not realistic that the jurors would succeed in keeping their lips sealed in the face of the alternating drama and tedium of the trial. In the interior workings of a jury there is room for impropriety that is short of unlawfulness. See *Commonwealth* v. *White, supra,* at 80; *United States* v. *Chiantese,* 582 F.2d at 979-980; *State* v. *Mimmovich,* 284 A.2d 282, 287 (Me. 1971). In the instant case, although the defendant urges it is mere speculation, it is fair to comment that the defendant was acquitted on eight of the twenty-one indictments against him and that, apparently, although the mouths of some of the jurors may have been too open, their minds were not shut.

*Order denying motion for a new trial affirmed.*

*Judgment affirmed.*

---

[8] For a general discussion on the subject of impeachment of jury verdicts, see Coyne, The Penelope Syndrome: Irrationality in Impeachment of Jury Verdicts, 23 B.B.J. No. 11, 9 (1979).