David MEDRANO–QUIROZ, Appellant,

v.

UNITED STATES, Appellee.

Ronald W. SERMENO, Appellant,

v.

UNITED STATES, Appellee.

Nos. 94–CF–1517, 94–CF–1611, 95–CF–1564.

District of Columbia Court of Appeals.

Argued and Submitted * Sept. 11, 1997.

Decided Oct. 30, 1997.

* Appellant Medrano–Quiroz' appeal was argued to the court. Appellant Sermeno's appeal was submitted without oral argument.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein and Cynthia Goode, Public Defender Service, were on the brief, for appellant David Medrano–Quiroz.

Tamara A. Shockley, Washington, DC, filed a brief for appellant Ronald W. Sermeno.

James E. Boasberg, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

David Medrano–Quiroz and Ronald W. Sermeno were convicted by a jury of distribution of cocaine and of possession of cocaine with intent to distribute it, in violation of D.C.Code § 33–541(a)(1) (1993).[1] On appeal, their principal contention is that the trial judge abused his discretion by refusing to disqualify a juror for misconduct.[2] We affirm.

## I.

### THE TRIAL COURT PROCEEDINGS

#### A. *The evidence.*

The prosecution presented evidence which, if credited, established that on September 1, 1993, officers of the Metropolitan Police Department, who were in a concealed observation post and using binoculars, saw Medrano–Quiroz and Sermeno sell two small white objects to their codefendant, Larry Peay.[3] The officers in the observation post broadcast descriptions of all three participants in the transaction. Other officers promptly apprehended Peay and recovered from his person two white rocks of crack cocaine.

Soon thereafter, Medrano–Quiroz and Sermeno were also arrested. Immediately before his apprehension in a pool hall, and upon making eye-contact with an officer, Medrano–Quiroz threw into a trash can some white paper which he was holding in his hands. An

---

1. Medrano-Quiroz was also convicted of willful failure to appear in court, in violation of D.C.Code § 23–1327(a) (1996).

2. Sermeno also contends that the evidence against him was insufficient to support his convictions and that the trial judge erred in denying his motion for judgment of acquittal. These contentions are without merit. *See, e.g., Taylor v.*

*United States,* 662 A.2d 1368, 1371–72 (D.C. 1995); *Lawrence v. United States,* 603 A.2d 854, 858 (D.C.1992).

3. Peay was convicted of unlawful possession of cocaine, in violation of D.C.Code § 33–541(d). He did not appeal.

officer retrieved the paper, which contained twelve rocks of crack cocaine. Medrano–Quiroz had $158.00 on his person.

Sermeno was apprehended while he was seated on a bicycle. Upon the approach of the officers, he attempted to stuff three loose white rocks into a hollow in the handlebars. The rocks were recovered and also proved to be crack cocaine. Upon searching Sermeno, the officers found $90.00.

None of the defendants testified or called any witnesses.

B. *Juror No. 9.*

The trial of the case against Medrano–Quiroz, Sermeno and Peay began on June 13, 1994. As a part of his preliminary instructions, which were delivered prior to opening statements, the judge ordered the jurors not to discuss with one another, or with anyone else, "anything at all about the case, no matter how insignificant it may seem to you."

During her opening statement, Peay's attorney told the jurors that the police had planted on her client the crack cocaine that they claimed to have found in his possession. She stated that

> when the officers stopped Mr. Peay, they threw him up against the wall, and they searched him. Those officers did not find any drugs on Mr. Peay. At that point, ladies and gentlemen, the officers had a choice to make. They could either let Mr. Peay go, and not go back around the corner and arrest two men that they thought were selling drugs, or they could say that they found drugs on Mr. Peay. And, that way they could go right back around and look for the two men that they thought were selling drugs. And, that's exactly what those police officers did, ladies and gentlemen.

Following the completion of counsel's opening statements, the deputy clerk, Mr. Evans, led the jurors to the jury room. While en route, Evans heard one of the jurors—Juror No. 9—say to no one in particular something to the effect that "isn't that incredible, [that] the police would just plant something on somebody?" Evans told Juror No. 9 that "you're not supposed to be talking about the case." At this point however, Evans did not report the incident to the judge.

The trial proceeded until, on June 16, 1994, the judge was obliged to take a lengthy recess because appellant Sermeno failed to appear. While waiting for the trial to resume, Juror No. 9 was sitting in a hallway near the jury room when Daniel Harn, Esquire, a criminal defense attorney who practices in the Superior Court, walked by. Harn and Juror No. 9 were friends and neighbors, and they struck up a conversation with one another.

According to the account later provided to the court by Harn, Juror No. 9 told Harn that he was a member of a jury in a criminal case, but that he believed that there might be a mistrial in his case because nothing had happened all day. Harn explained that there could be all kinds of reasons for the delay. The juror told Harn that the judge had ordered the jurors not to discuss the case. Juror No. 9 then followed Harn into another courtroom and observed proceedings in an unrelated matter in which Harn was appearing before a different judge. After Harn's case had been completed, the two men left the courthouse together and rode the Metro to a station near their residences. Harn then drove Juror No. 9 home in Harn's private automobile.

While Juror No. 9 was riding in Harn's car, he told Harn that the case in which he was a juror involved two defendants charged with selling drugs and one charged with possession. According to Harn, Juror No. 9 then stated "something to the effect [that] it was all he could do to restrain himself when he heard the lawyers say that the police planted the drugs in the pocket of the man charged with possession because they wanted to get the seller so bad." Harn said that he made no verbal response to Juror No. 9's comment, but that Juror No. 9 "may have been sort of giggling, and I might have involuntarily sort of giggled along with him." According to Harn,

> I did not say anything and he did not say anything more. He did not tell me what stage the trial was in; did not tell me whether or not there was any testimony. And that was it. Our conversation basical-

ly ended with well, I hope that you're right that there is a mistrial so you don't miss work. And he said no, I hope there isn't a mistrial because it's an interesting case. I want to sit on it.

Meanwhile, the judge had issued a bench warrant for Sermeno, and the warrant was executed later on June 16, 1994. The trial resumed on the following day, Friday, June 17. Following closing arguments and the court's instructions, the jury began to deliberate at 3:45 p.m. Shortly thereafter, the jurors were excused for the weekend.

On Monday, June 20, Harn encountered Eric Yaffe, Esquire, who was prosecuting the three defendants. Harn told Yaffe that he had heard that there would be a mistrial in a case that Yaffe was handling. Yaffe explained that no mistrial was anticipated, and Harn then related his conversation with Juror No. 9. Harn told the court that he "gave [Yaffe] that little nugget, that theory of defense, and that was it." Yaffe appropriately reported to the court the facts that he had learned from Harn and, on the morning of June 21, 1994, the judge convened a hearing on the matter.

### C. The hearing.

The hearing regarding Juror No. 9's conduct began before the jury resumed deliberations. The proceedings were conducted outside the presence of the jury. After discussing with counsel the manner in which the matter should be handled, the judge called in first Harn and then Juror No. 9 and interrogated each regarding the incidents which the prosecutor had reported to the court.

Harn's account of his conversations with Juror No. 9 has been set forth in Part II.B of this opinion. When it was Juror No. 9's turn to respond to questions from the judge, the

juror confirmed that he had encountered Harn outside the jury room, that he had watched proceedings in another courtroom, and that he had ridden home with Harn. Juror No. 9 denied, however, that there had been any conversation in Harn's car regarding the case before the court. After the questioning of Juror No. 9 had been completed, Deputy Clerk Evans reported to the court the comments that this juror had made immediately after opening statements.

The judge asked the attorneys to state their positions in light of the foregoing disclosures. In response, counsel for all three defendants argued that Juror No. 9 should be disqualified.[4] There were, however, differences between the attorneys as to how the court should proceed. Peay's counsel urged the judge to reopen the questioning of Juror No. 9 and to confront him with Harn's account of the conversation in the car. The attorneys for Medrano–Quiroz and Sermeno, however, were reluctant for tactical reasons to agree to further interrogation of Juror No. 9 prior to verdict, lest further questioning prejudice him against the defense.

The judge declined to disqualify the juror or to declare a mistrial "at this point."[5] He expressly credited Harn's description of his conversation with Juror No. 9. The judge also commented that

I don't think it's likely [that] this juror forgot. He remembers the details of a conversation essentially the way Mr. Harn does that happened an hour and a half earlier, and it's not likely, really, that he forgot.

The judge stated:

[I]t does seem to me that the potential problems, whatever their extent may be with this person, there is no particular reason frankly in my mind to believe from

---

4. Peay's attorney and Sermeno's attorney asked the judge to declare a mistrial. Counsel for Medrano–Quiroz made no specific motion for a mistrial, but contended that Juror No. 9 should not be permitted to remain on the jury. All three defense attorneys stated that they were willing to complete the trial with eleven jurors, but the prosecutor declined to consent to such a procedure. At the time of the trial, the judge lacked authority to proceed with eleven jurors over a

party's objection. See Duvall v. United States, 676 A.2d 448, 449 n. 1 (D.C.1996).

5. The judge and several attorneys correctly noted that an immediate definitive ruling was unnecessary because, in the event that any defendant was acquitted, or if the jurors proved to be unable to reach a unanimous verdict as to any defendant, then that defendant's motion for a mistrial would become moot.

everything that we have heard that this problem is any more serious than this person having from the first moment forward been not enthusiastic about Mr. Peay's litigation strategy. And having expressed it, walking down the hall with Mr. Evans, and I'm prepared to find having expressed it to Mr. Harn. If we accept that as true, it doesn't seem to me that there is any reason from anything we have known to think that that person with that view of Mr. Peay's defense couldn't be a completely fair and impartial juror in evaluating [Medrano–Quiroz'] case, and whether the government has proven it beyond a reasonable doubt. And the same thing with regard to [Sermeno's] case.

The judge cautioned, however, that "I'm just thinking this through as I go here," and he made it plain that his ruling was not yet cast in stone.

Medrano-Quiroz' attorney suggested that the appropriate way to proceed would be "[l]etting the jury deliberate and having *voir dire* after verdict to see if there was any taint." Sermeno's attorney and the prosecutor agreed, and the judge proceeded as counsel suggested and directed the jurors to resume their deliberations.

Shortly before 1:00 p.m., the jury returned a verdict of guilty against all three defendants on all charges. The judge then called in Juror No. 9 for a second round of questioning. Juror No. 9 now softened in some measure his previous categorical representation that he and Harn had not discussed the case; he asserted that he did not remember having the conversation in the car which Harn had described to the court. The juror did, however, recall stating, in the presence of the deputy clerk, that "I thought it funny that one would think that the cops were

planting evidence on people and using that as a way of convicting." Juror No. 9 believed that "just the clerk was listening to me at the time." According to Juror No. 9, the deputy clerk made no comment. At the conclusion of his final questioning of Juror No. 9,[6] the judge asked all counsel if they had any further requests. The prosecutor and the attorneys for the two appellants all answered in the negative.[7]

The jurors were excused, and the judge and the attorneys immediately proceeded to the selection of sentencing dates. Counsel made no further request or comment in relation to the alleged misconduct on the part of Juror No. 9. Indeed, no party demanded a new trial or any other relief in the trial court after the completion of the post-verdict questioning of Juror No. 9.

## II.

### LEGAL DISCUSSION

#### A. *Preservation of the issue for appeal.*

As an initial matter, we note that there is a substantial question as to whether Medrano–Quiroz and Sermeno properly preserved for appeal their objections to Juror No. 9's continued presence on the jury. During his discussions with counsel prior to the verdict, the judge declined to declare a mistrial "at this point,"[8] and he plainly contemplated further proceedings on the issue in the event that the defendants or any of them were convicted. Counsel for both appellants agreed that further questioning of Juror No. 9 and the ultimate resolution of the issue of juror bias should be deferred until after the verdict. To the extent that, prior to the completion of the jury's deliberations, the trial judge had declined to disqualify Juror

6. During the second round of questioning, Juror No. 9 also remarked that he "may have been trying to get information out of [Harn]." After the judge had told the juror to return to the jury room, Peay's attorney asked the judge to inquire further about Juror No. 9's request for information. The judge summoned the juror for a third time and directed him to elaborate on his attempt to obtain information from Harn. The juror stated that he had wanted to know "how things work in terms of the quantities that we have been looking at" and whether the jurors

would be present for sentencing. According to Juror No. 9, Harn gave him no information on these subjects.

7. Peay's counsel requested a *voir dire* examination of all of the jurors. The judge denied this request.

8. The judge used the phrase "at this point" or "at this time" on several occasions during the pre-verdict stage of the hearing.

No. 9 at all, he had only done so provisionally, on an incomplete record, and without prejudice to further requests for relief by the defendants after the questioning of the juror had been completed.

In conformity with his previously announced intentions, the judge interrogated Juror No. 9 for a second time (and later a third time) after the three defendants had all been found guilty. When the judge inquired, at the conclusion of the questioning, whether counsel had anything further, however, the attorneys for both appellants responded that they had nothing. Significantly, no party asked the judge for any relief after the questioning of Juror No. 9 had ended, even though this was the first time that all of the relevant facts were before the court. Having declined to disqualify Juror No. 9 on an incomplete record, the judge was never requested to rule on that juror's conduct once the record was complete.

Counsel's failure to renew their motions might be of little consequence if the post-verdict record had been essentially the same as the pre-verdict record, but this was not so. On the question whether or not Juror No. 9 deliberately deceived the court, for example—a critical issue, according to the appellants—the judge might well have taken into consideration the juror's post-verdict acknowledgment that, shortly after counsel had presented their opening statements, he made a comment questioning Peay's proclaimed defense. Arguably, appellants' claim that Juror No. 9 had lied in order to conceal prejudice that he harbored against the defense was significantly weakened by his post-verdict responses, which may have made him come across as significantly more candid.

We have stated, in a somewhat different but nevertheless comparable context, that "a party who neglects to seek a ruling on his motion fails to preserve the issue for appeal." *Thorne v. United States,* 582 A.2d 964, 965 (D.C.1990). We have also held that where the judge has denied a defendant's prayer for

relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew his request on the basis of the changed circumstances in order to preserve for appeal any contention based on the record as modified. *(Leon A.) Wilson v. United States,* 558 A.2d 1135, 1143 (D.C.1989).

Given these authorities, as well as the silence of defense counsel at the key stage of the trial court proceedings, the government might plausibly have argued that the appellants have not preserved for our consideration the principal issue which they have asked us to decide. We note in particular that although the only remedial action requested by Medrano–Quiroz and Sermeno in the trial court—a mistrial (Sermeno) and the disqualification of the juror (Medrano–Quiroz)—was of the kind that is available during (but not after) trial, appellants now apparently assert that once the record was complete, the judge should have granted post-verdict relief—*i.e.,* a *new trial*[9]—even though no motion for a new trial was filed by either appellant in the court below.[10]

Procedurally, appellants thus find themselves in an awkward position. If they are complaining of the judge's refusal to disqualify Juror No. 9 in mid-trial, their appeal is undermined by essentially undisputed realities, namely, that the judge plainly had the authority to defer further questioning of the juror until after verdict, that both appellants agreed to that procedure, and that, as all participants well knew, the record would remain incomplete until that questioning was completed. If, on the other hand, appellants are claiming that the judge should have ordered a new trial on the basis of the full record developed after the verdict, then they are confronted with a different obstacle, namely, that the trial judge was never asked to rule on that record, that he therefore never did so, and that this court is now being asked to decide an issue which the trial judge never addressed.

---

9. By the time the record as to Juror No. 9 was complete, it was too late to disqualify him or to declare a mistrial, for the jury had already completed its work and found both appellants guilty.

10. Rule 33 of the Superior Court's Rules of Criminal Procedure requires a motion for a new trial not based on newly discovered evidence to be filed within seven days after verdict. No such motion has been filed to the present date.

The government does not contend, however, that appellants' claims are barred by the failure of their counsel to speak up after the verdict was returned. On the contrary, the government has expressly conceded that Sermeno has preserved for appeal his objections to the continued participation of Juror No. 9. Although the government has asserted that Medrano–Quiroz' appeal is procedurally defective on other grounds,[11] it has not argued that his counsel's post-verdict omissions should affect the proper disposition of his appeal. Moreover, both appellants had forcefully objected, earlier in the proceedings, to Juror No. 9's continued participation in the case, and neither ever indicated that his position had changed. Under these circumstances, we have elected to consider the issues as they have been presented to us. In the absence of any relevant objection by the government, we address appellants' contentions on their merits. As will be apparent, however, appellants' failure to ask the judge to make a finding whether Juror No. 9 lied has some bearing on whether the judge abused his discretion in refusing to excuse the juror.

### B. The standard of review.

■ The right to a trial by an impartial jury is "fundamental and deeply embedded in American jurisprudence." *Hughes v. United States,* 689 A.2d 1206, 1207 (D.C.1997); *see also Irvin v. Dowd,* 366 U.S. 717, 721–22, 81 S.Ct. 1639, 1641–42, 6 L.Ed.2d 751 (1961). "One touchstone of a fair trial is an impartial trier of fact." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984). "In the [perplexingly enigmatic] language of Lord Coke, a juror must be as 'indifferent as he stands unsworn.'" *Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642 (quoting Co. Litt. 155b). "The theory of the law is that a juror who has formed an opinion cannot be impartial."

*Reynolds v. United States,* 98 U.S. 145, 155, 25 L.Ed. 244 (1878).

■ Where, as here, the impartiality of a juror has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit. *See, e.g., Leeper v. United States,* 579 A.2d 695, 698 (D.C. 1990) (citations omitted). In the present case, the judge held an extensive hearing, and the defendants were afforded a full opportunity to state their positions and to suggest questions to be posed to Harn and to Juror No. 9. Appellants have not challenged the procedures utilized by the trial judge or the fairness of the hearing. Indeed, on this record, no such challenge could reasonably be sustained.

■ Under these circumstances, the scope of our review of the judge's refusal to disqualify Juror No. 9 is quite narrow. "Following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, ... and the findings of fact underlying that determination are entitled to great deference." *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 185 (D.C.1990) (citation and internal quotation marks omitted). "Our review is deferential because the question of prejudice turns substantially on the judge's appraisal of the juror's demeanor, ... and is therefore one about which the trial judge is especially qualified to render a sound opinion." *Leeper, supra,* 579 A.2d at 698 (citations and internal quotation marks omitted). The key fact here is that Judge Morrison had the opportunity on three separate occasions to question Juror No. 9 and to obtain a first-hand impression of his demeanor, credibility, and impartiality. The cold record available to an appellate court—a "dehydrated peach," Judge Jerome Frank has called it [12]—cannot

11. According to the government, the failure of counsel for Medrano–Quiroz to move the court to declare a mistrial precludes this defendant (but not Sermeno) from arguing on appeal that Juror No. 9 should have been disqualified. Because we must reach the merits of appellants' challenge to Juror No. 9 in order to decide Sermeno's appeal, and because we resolve the substantive issue of that juror's qualifications in favor of

the government, we need not and do not address the government's contention that the lack of a demand for a mistrial rendered Medrano–Quiroz' appeal procedurally deficient.

12. *Broadcast Music, Inc. v. Havana Madrid Restaurant Corp.,* 175 F.2d 77, 80 (2d Cir.1949) (citation omitted) (quoted in *Stewart v. District of*

provide us with comparable insight into the problem at hand. In *United States v. Klee,* 494 F.2d 394 (9th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974), the court stated: "[W]hen a wise and experienced judge, who presided at the trial and observed the jury, comes to [the conclusion that the defendant was not prejudiced by juror misconduct], it is not for us to upset it." *Id.* at 396. In most cases, and assuredly in this one, we agree.

 Substantively, the appellants had the burden of proving by a preponderance of the evidence that Juror No. 9 was biased against them. *Smith v. Phillips,* 455 U.S. 209, 215–18, 102 S.Ct. 940, 944–47, 71 L.Ed.2d 78 (1982); *United States v. Maseratti,* 1 F.3d 330, 337 (5th Cir.1993). More specifically, they were required to establish a "substantial likelihood of actual prejudice" as a result of the juror's unauthorized contact (or, in this case, as a result of the juror's failure to follow the judge's instructions and his related actions and statements). *See Hill v. United States,* 622 A.2d 680, 684 (D.C. 1993). Once a defendant has carried this initial burden, however, "all reasonable doubts about the juror's ability to render an impartial verdict must be resolved in favor of the accused." *Id.* (citations, internal quotation marks and internal brackets omitted).

## C. *The merits of appellants' motions.*

Notwithstanding the deferential standard of review, appellants contend that the judge's refusal to disqualify Juror No. 9 deprived them of their right to a fair trial by an impartial jury. They argue, in substance, as follows:

1. Juror No. 9 disregarded the trial judge's instructions by discussing the case with Harn (and, to some extent, by making the comments overheard by the deputy clerk);

2. Juror No. 9's premature disparagement of Peay's "planting" defense demon-

strates that he prejudged the case and failed to keep an open mind;

3. The possibility that Harn chortled or "giggled" after Juror No. 9 ridiculed that defense during the conversation in Harn's car constituted "expert" confirmation of the juror's premature rejection of the "planting" defense; and

4. Juror No. 9 was untruthful when he denied that he had discussed the case with Harn, and this deception compounded his disregard of the court's instructions and undermined his trustworthiness and impartiality.

We agree with appellants that the conduct of Juror No. 9 was unfortunate. Nevertheless, we do not believe that appellants' contentions, individually or in the aggregate,[13] demonstrate that the trial judge abused his discretion by refusing to disqualify the juror, either before verdict or thereafter.

### (1) *The juror's disregard of instructions.*

 We agree with the appellants that if Harn's testimony is believed—and the trial judge, for sound reasons, expressly credited it—then there can be no doubt that Juror No. 9 violated the court's instructions by discussing the case with Harn. Indeed, the remarks which the juror made, early in the proceedings, within the hearing of the deputy clerk, were also improper. It is well established, however, that standing alone, a juror's unauthorized comments about a pending case will not require his disqualification in the absence of a showing of prejudice. *See, e.g., (Woodrow J.) Wilson v. United States,* 663 A.2d 558, 562–63 (D.C.1995) (where a juror had telephoned a prosecutor friend and posed questions regarding procedures in drug cases, but prosecutor terminated conversation, the trial judge did not abuse her discretion by declining to order a new trial). We agree in this regard with the following statement by the court in *United*

*Columbia Dep't of Employment Servs.,* 606 A.2d 1350, 1353 n. 5 (D.C.1992)).

13. Medrano-Quiroz also apparently argues that Juror No. 9's remark to Harn that he (the juror) found the case to be an interesting one and hoped that there would be no mistrial reflected a

disposition to try to stay on the jury to press for his prejudiced point of view. In our view, however, the trial judge could quite appropriately conclude that, in this context, the juror's interest in continuing to serve was irrelevant to the issue of bias.

States v. Boylan, 698 F.Supp. 376, 391 (D.Mass.1988), aff'd, 898 F.2d 230 (1st Cir.), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990), and with the authorities cited by the court:

> Jurors may make statements about the case yet keep their minds open to the remaining evidence and give the defendant a fair trial. See, e.g., Grooms v. Wainwright, 610 F.2d 344 (5th Cir.), cert. denied, 445 U.S. 953 [100 S.Ct. 1605, 63 L.Ed.2d 789] ... (1980) (Trial judge did not err in refusing to interrogate jurors about one juror's statement "from what I heard he's already guilty" made after close of the prosecution's case because statement did not reflect serious prejudice but only objective evaluation of evidence to date); United States v. Chiantese, 582 F.2d 974 (5th Cir.1978), cert. denied 441 U.S. 922 [99 S.Ct. 2030, 60 L.Ed.2d 395] ... (1979) (court did not err in refusing to hold a hearing when after a particular cross examination a juror remarked to other jurors about the attorney "Stupid. Stupid. Stupid. He's a pain in the ——" because the remark did not indicate partiality); United States v. Klee, 494 F.2d 394 (9th Cir.), cert. denied, 419 U.S. 835 [95 S.Ct. 62, 42 L.Ed.2d 61] ... (1974) (no mistrial warranted when one juror states by affidavit that nine of the jurors expressed opinions as to guilt before the close of the case, given jury's impartiality evidenced by their request for re-reading of court's instructions on sole issue in the case). The important thing is not that jurors keep silent about the case but that each juror keeps an open mind until the case has been submitted to the jury. Klee, 494 F.2d at 396.

In Boylan, and in the cases there cited, the comments made by various jurors in violation of the judge's instructions were directed to other jurors. In the present case, there is no evidence that any juror heard any improper comment by Juror No. 9, a circumstance which further weakens appellants' position. On this record, Juror No. 9's unfortunate failure to follow the judge's directions was not sufficient to disqualify him.

"[F]ew trials would pass constitutional muster if a new trial [were] required each time that a juror was discovered in a potentially compromising situation." Boylan, supra, 698 F.Supp. at 385 (citing Smith, supra, 455 U.S. at 217, 102 S.Ct. at 946). Juror No. 9 undoubtedly missed at least two golden opportunities to remain silent. Nevertheless, "although the mouth[ ] of [one] of the jurors may have been too open, [his] mind [was] not [necessarily] shut." Commonwealth v. Scanlan, 9 Mass.App.Ct. 173, 400 N.E.2d 1265, 1272 (1980).

(2) Pre-judgment of the case.

 Appellants contend, however, that the substance of the remarks made by Juror No. 9 to Harn and, earlier, in the presence of the deputy clerk, reflected a predisposition on the part of the juror to favor the prosecution. As we have noted on page 7, supra, the trial judge found no reason to conclude that the juror's disagreement with the "planting" defense outlined by Peay's attorney in her opening statement precluded him from being a "completely fair and impartial juror." We are satisfied that the judge's assessment was entirely reasonable.

One cannot fairly expect any juror's mind to be a tabula rasa with respect to the kind of issue presented here. See, e.g., United States v. Kelly, 722 F.2d 873, 880 (1st Cir. 1983), cert. denied, 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984); Boylan, supra, 698 F.Supp. at 385. The traffic in unlawful drugs, and the measures taken by law enforcement officers to combat it, are matters of public interest and concern. It is unlikely that "those best qualified to serve as jurors will not have formed some impression or opinion [on these controversial subjects]." Irvin, supra, 366 U.S. at 722–23, 81 S.Ct. at 1642.

Of particular importance here, moreover, is that the juror expressed his skepticism of Peay's defense after hearing it described in opening statement; any "bias" he evinced was against the plausibility of a frame-up as outlined in this case. A juror without any pro-prosecution bias whatever might well have been skeptical of the assertions in Peay's opening statement. According to

Peay's attorney, the officers of the "arrest" or "jump-out" squad "planted" crack cocaine on her client so that *the sellers,* Medrano–Quiroz and Sermeno, could be arrested and successfully prosecuted for distribution of drugs. So far as a juror listening to the opening statement could discern, however, the police—actually, the officers in the observation post, not the "jump-outs"—based their belief that appellants were sellers largely on their observation of appellants' transaction with Peay. It was for the alleged sale to this particular buyer that the two men were arrested. If, in fact, appellants did not sell cocaine to Peay, and if the police knew this to be so, then the motive to plant drugs on Peay which counsel ascribed to the police—namely, to apprehend two drug sellers—makes little practical sense.[14]

We emphasize that this is not a case in which a juror conveyed or intimated to anyone that he had a closed mind with respect to the guilt or innocence of any defendant, even of Peay,[15] or that he would refuse to listen to the evidence, or to counsel's arguments, or to the judge's instructions. Rather, Juror No. 9 voiced "out loud" on two occasions an impression which other reasonable jurors may well have shared, but which they apparently kept to themselves until the case was submitted to the jury. The record reflects juror impropriety, but the judge could reasonably conclude that it does not show lack of juror impartiality.

### (3) Harn's possible "giggle."

■ Appellants next argue that the possibility that Harn "may have been sort of giggling" in response to Juror No. 9's disparagement of Peay's "planting" defense compounded Juror No. 9's alleged lack of impartiality. They point out that Harn was a criminal lawyer who practices before the Superior Court, and that Juror No. 9 knew of Harn's profession and presumably viewed him as an expert on criminal trials. Harn's possible chortle, according to appellants, conveyed to Juror No. 9, from a seemingly authoritative source—indeed, from a sort of expert witness [16]—the idea that the juror's ridicule of Peay's defense was right on target. We are not persuaded.

■ "The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith, supra,* 455 U.S. at 217, 102 S.Ct. at 946. Accordingly, as Judge Henry Friendly has written,

> [t]he touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a "witness" and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice.

*United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) (citations omitted).

In the present case, the allegedly infiltrated "molecules of extra-record matter" alleged to warrant reversal consist of the possibility of a lawyer's responsive giggle. Harn was not sure if he giggled. If he did, it is not readily apparent that Juror No. 9 would have known what, if anything, Harn was seeking to convey by means of this wordless intimation of mirth. Harn testified unequivocally that he did not say anything to Juror No. 9 about the case or about "planting" defenses.

14. Peay's attorney did not claim that the officers planted the drugs in order to frame just anybody. Rather, she asserted that the police wanted to arrest Medrano–Quiroz and Sermeno because the observation post officers believed that the two appellants were, in fact, selling drugs.

15. It is also worth noting that only Peay's attorney argued that the officers had planted drugs. Sermeno's trial counsel admitted that his client possessed the cocaine secreted in the handlebars of the bicycle, but argued that the contraband was for Sermeno's personal use. Medrano–Quiroz' attorney contended that his client was misidentified and that, contrary to the police account, Medrano–Quiroz had not placed any crack cocaine into a trash can.

16. At oral argument, counsel for Medrano–Quiroz argued that Harn's "confirmatory giggle" was significant because Harn was an attorney and not, in the judge's phrase, "a tree-trimmer."

If the trial judge viewed the giggle as inconsequential, we cannot fault him for that.[17]

In any event, Juror No. 9 first expressed his skepticism about the "planting" defense immediately after Peay's attorney had made her opening statement. No evidence was introduced in support of defense counsel's theory, and nothing occurred at trial which would have compelled a reasonable juror to alter his initial negative impression of counsel's theory. The trial judge could quite properly conclude that, insofar as "the giggle that may have been" was concerned, "the probability of prejudice," *McMann, supra,* 435 F.2d at 818, was nil. In other words, the judge discerned no appreciable possibility that the verdict as to any defendant would have been different if Harn had kept a straight face. This assessment did not constitute an abuse of the judge's considerable discretion.

### (4) *Lying to the court.*

■ Finally, appellants contend that Juror No. 9 lied to the court when he denied that he had discussed the case with Harn while riding in Harn's car. According to appellate counsel for Medrano–Quiroz, the juror's "motive for lying was to conceal his own misbehavior and the extent of his partiality, both before and after his conversation with Mr. Harn." Medrano–Quiroz claims that "under these circumstances, the trial court's refusal to strike [Juror No. 9] from appellant[s'] jury cannot be reconciled with the Sixth Amendment right to trial by impartial jurors."

■ The issue raised by both appellants regarding the trustworthiness of Juror No. 9 is a troubling one. Lying to the court, if that is what Juror No. 9 did, is serious business. We do not accept the notion that a juror who deliberately attempts to deceive the judge during an inquiry as to the juror's qualifications "is no worse than the student who claims the dog ate his homework." *ABF Freight Sys., Inc. v. NLRB,* 510 U.S. 317, 325–26, 114 S.Ct. 835, 840, 127 L.Ed.2d 152 (1994) (Kennedy, J., concurring). In the present context, a false answer to a question

from the judge had the potential to subvert the course of justice by depriving the three defendants of their right to a trial by an impartial jury. When a juror lies to the court in order to conceal information tending to show prejudice on the juror's part, his conduct reflects "impermissible partiality" and is "quite inconsistent with an expectation that [the juror] will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court." *United States v. Colombo,* 869 F.2d 149, 151–52 (2d Cir.1989) (citation omitted). If Juror No. 9 had been trying to hide his own lack of impartiality, we would be compelled to reverse appellants' convictions.

■ The Supreme Court has made it clear, however, that not every false statement by a juror during a *voir dire* examination warrants the juror's disqualification. The Court has formulated the applicable principles as follows:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough Power, supra,* 464 U.S. at 556, 104 S.Ct. at 850; *see also Harris v. United States,* 606 A.2d 763, 766 n. 5 (D.C.1992) (applying *McDonough Power* standard in a criminal case). In *United States v. North,* 285 U.S.App. D.C. 343, 910 F.2d 843 (1990), the court held that a defendant who requests the court to reverse his conviction on the basis of deliberately untruthful answers provided by a juror "must show that the juror's correct response at *voir dire would have demonstrated actual bias.*" 285 U.S.App. D.C. at 404, 910 F.2d at 904 (emphasis added). The court explicitly rejected the defendant's argument that "juror dishonesty at *voir dire* is *per se* evidence of the juror's

---

17. Counsel for appellants had ample opportunity to ask the judge to interrogate Juror No. 9 regarding Harn's possible expression of amusement, but neither did so.

partiality and therefore compels a mistrial." 285 U.S.App. D.C. at 404, 910 F.2d at 904. "[C]oncealment ... is only one factor—albeit an important one—in the critical test for actual bias," *id.* at 404, 910 F.2d at 905; it is only one ingredient in our determination of whether appellant has shown a "substantial likelihood of actual prejudice" as a result of the juror's conduct. *Hill, supra,* 622 A.2d at 684.

Applying these principles to the present case, we are unable to agree with appellants' contention that the trial judge abused his discretion by refusing to disqualify Juror No. 9. First, the judge never made a finding that the juror deliberately lied. The judge did state, following his initial pre-verdict interrogation of Juror No. 9, that he thought it unlikely that the juror had forgotten his conversation with Harn in the latter's car. That conclusion, however, was based on an incomplete record. Juror No. 9's subsequent candid acknowledgment that he made the remarks overheard by the deputy clerk, and his admission that he had attempted to elicit additional information from Harn, might well have led the judge to a somewhat more favorable appraisal of the juror's veracity. We will never know what the judge believed, however, because appellants' counsel failed to request an up-to-date finding as to whether Juror No. 9 lied.

But even if we assume, *arguendo,* that Juror No. 9 lied and that, if asked, the trial judge would have so found, appellants have not satisfied the second prong of the *McDonough Power–North* test. For the reasons we have stated at pages 653–654, *supra,* a correct response by Juror No. 9 to the judge's question about his conversation with Harn would not have demonstrated a substantial likelihood of actual bias. Moreover, it is not at all evident that the motive for the juror's lie, if it was a lie, was to conceal his own supposed lack of impartiality.

On the contrary, so far as this record reveals, the most obvious incentive for deception on the juror's part was the universal instinct for self-preservation. Presumably, Juror No. 9 did not want it known that he had violated the judge's order not to discuss the case. No reasonable person wants to be held in contempt of court. Fear of punishment may not be a noble motive for a lie, but a desire to avoid punishment provides a persuasive explanation of the juror's lack of candor regardless of whether he was pro-prosecution, pro-defense, or endowed with Solomonic impartiality. At the very least, the judge could properly conclude, without abusing his discretion, that Juror No. 9's failure to admit what he had said to Harn, reprehensible as it was, did not establish that this juror was prejudiced against the appellants.

### III.

### CONCLUSION

The following passage from the Supreme Court's opinion for the Court in *McDonough Power* is instructive for purposes of the present case:

> This Court has long held that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials.... Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload....
>
> We have also come a long way from the time when all trial error was presumed prejudicial and reviewing courts were considered citadels of technicality.... The harmless-error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for "error" and ignore errors that do not affect the essential fairness of the trial.

*McDonough Power, supra,* 464 U.S. at 553, 104 S.Ct. at 848 (citations, internal quotation marks, and internal brackets omitted). Taking into consideration all of appellants' contentions, we conclude that the improper conduct of Juror No. 9 "did not affect the essential fairness of the trial," *id.,* and that the trial judge did not abuse his discretion either by permitting Juror No. 9 to remain

on the jury at the pre-verdict stage or by refusing, *sua sponte,* to order a new trial after the jury had returned its verdict.

*Affirmed.*

PRYOR, Senior Judge, dissenting:

## I.

Having reviewed the same case decisions, and the same factual record as the majority, I conclude that appellant was entitled to a verdict free from the participation of the juror in question.

Against the background of the customary judicial admonition not to discuss the case except in deliberation, this juror—Juror number 9—engaged in a pattern of questionable behavior throughout his service on the case. During a court recess shortly after opening statements, the courtroom clerk overheard the juror state aloud, but to no one in particular, that he questioned whether the police would plant evidence on someone in order to gain a conviction. The clerk reminded the juror that he was not to talk about the case in that setting. Later, after the case was submitted to the jury for deliberation, the trial judge learned that Juror number 9 had had a chance encounter and conversation with a neighbor, a defense attorney, who practiced in the trial court. Upon reflection, the lawyer decided to disclose the matter. In a hearing outside the presence of other jurors, the lawyer related that he saw his neighbor in a hallway and was informed that the neighbor was on jury duty. Without the lawyer being aware, the juror followed and observed the lawyer in a brief proceeding in a courtroom. Upon leaving the courtroom, the lawyer agreed to give the juror a ride in his car. As the lawyer recounted the time together, the juror stated that he could hardly restrain himself, when it was argued in the case being heard, that the police planted drugs on one of the defendants. The lawyer recalled that he may have laughed a little in response, but said nothing expressly on the subject. The juror, in answer to questions from the judge said, on two occasions, that he had not talked to his neighbor, nor anyone else, about the case.

## II.

Once a case has been presented to a jury and given to them for deliberation, the role of the judge and counsel recedes. Questions of the kind that arose here can be multifaceted. The judge must make a reasonable effort to ascertain pertinent facts. At the same time, care must be taken not to intrude upon or unduly influence the jury's function. It is this balancing of factors, which we commonly refer to as trial judge discretion. Such an approach recognizes that there is no one "correct" response to the wide range of questions which arrive suddenly and unexpectedly at the trial judge's door.

In this instance the trial judge, with the participation of counsel, made a diligent and careful effort to resolve the problem. Indeed he tried unsuccessfully—because government counsel would not agree—to get the parties to proceed with an eleven person jury.[18]

This case does not involve tampering with a juror from an external source, unauthorized juror investigation, demonstrable false statements by a juror during jury selection, or some other form of clearly identifiable misconduct. Rather this case presents questions more subtle in nature but nonetheless central to the jury function. The essence of factfinding is that the factfinder be free of bias or prejudice on determinative issues and similarly be reasonably impartial or open minded to the evidence presented. Thus courts require candor from jurors in response to inquiries and generally seek to preempt and minimize external influences upon their decisions. We have focused a primary concern on whether the accused has suffered actual bias at the hands of a juror which is the result of external communication. *Hill v. United States,* 622 A.2d 680, 684 (D.C.1993). Upon a showing of substantial likelihood of prejudice emanating from unauthorized contact, reasonable doubts should be resolved in favor of the accused. *Id.*

---

18. *See Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978) (a discussion of scientific studies of reduced jury size from the traditional number of twelve; reduction in size is generally deemed favorable to the prosecutor).

In the present situation, it is a combination of circumstances that causes me to conclude that the threshold of likelihood of prejudice has been satisfied and unremedied. Juror 9, despite instructions to the contrary, early in the case, showed an inclination to verbalize defenses being raised in the case in a public way. Later he raised the same aspect of this case under deliberation with a practicing attorney. We do not know, nor can we know, the complete and unedited nature of this encounter. The attorney stated that the juror's inquiry, understandably not elaborate or formal, went beyond generalities, but was about a specific defense raised in the case being heard. Although the judge made no specific finding, it appears that, in the course of questioning the juror, the court and counsel deemed him lacking in candor. Ultimately, in the last round of questioning after the verdict, the juror admitted that he had disobeyed some of the court's instructions, but felt it necessary to better understand how the system works.

I recognize that it is likely that any one of these episodes would probably not suffice as a basis for discharging a juror. But viewed in total, the record discloses a juror who disobeyed judicial instruction, who publicly and privately talked about a case under deliberation, was less than candid with the court, and who reluctantly conceded that he felt a need to figure out the system rather than simply decide the case.

Appellee essentially argues that the juror's contact with the attorney was so meager that it should not be viewed as substantial external contact, and further that none of the incidents form a nexus to actual prejudice in this case. Allowing the trial judge considerable room for discretion, it appears the standard of substantial likelihood of prejudice and partiality has been met. The wisdom of this standard is that it recognizes that, in reconstructing such matters, we simply can not know all the pertinent facts bearing on the question of juror prejudice. In fairness to the government, it is equally difficult to present rebuttal evidence. Thus, in my view, Juror 9 should not have been allowed to deliberate unless it was found that his response to the court left him in the posture of an impartial factfinder.

I would vacate the convictions, or alternatively, remand the case to allow the trial judge to make a finding from the existing record regarding the juror's truthfulness to the court. Thereafter, the judge could determine if relief is warranted.